IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ARTURO CASTRO-GUERRA | CIVIL NO.  14-1280 (SEC) |
| Plaintiff | FALSE CLAIMS ACT, 31 U.S.C.A. ξ 3729; |
| V. | TRUTH IN LENDING, 15 U.S.C.A.  §1601; FEDERAL HOME LOAN MORTGAGE, 12 U.S.C.A.  §1454. |
| FIRST BANK PUERTO RICO CORPORATION; JORGE E. PEREZ-CASELLAS; PREFERRED MORTGAGE CORPOTATION; CAPITAL TITLE SERVICES, INC. TITLE SECURITY GROUP, INC., | Jury Demand |
| Defendants | |

RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM OF LAW IN SUPPORT THEREOF

TO THE HONORABLE COURT:

COME NOW Plaintiff, Arturo Castro through the undersigned attorney who very respectfully STATES, AVERS, AND PRAYS as follows:

I.      INTRODUCTION

1.0.      On July 23, 2014, plaintiff Arturo Castro-Guerra filed the above-captioned civil action for compensatory and punitive damages, due to the violation of statutory rights of the Plaintiff by defendants, guaranteed by the Constitution and laws of the United States, and the Commonwealth of Puerto Rico. See, docket no. 20. Plaintiff also requested declaratory and injunctive relief to stop payments of mortgage loan, pending adjudication of the above-captioned Complaint, and the reversal of the purchase transaction in question.

1.1.     In his complaint, plaintiff Castro-Guerra alleges that he was subjected to deceptive real estate practices of false disclosure and misrepresentation in the purchase of a residential property owned and sold by defendant First Bank PR Corporation (hereinafter referred to as defendant First Bank) to Plaintiff Castro-Guerra, through defendant Preferred Mortgage Corp. Plaintiff further alleges that these false misrepresentations and lack of full disclosure during the purchase of the property have affected plaintiff Castro-Guerra, and other parties in this lawsuit, including FHA-HUD, as well as the owner/creditor of this mortgage note, the United State Federal Government Agency GNMA – FHA as to loan # 13-5444 which is the federal loan generated from transaction in question.

1.2.     Plaintiff alleges that this action arises under the Equal Protection of the Law Clause, the False Claims Act 31 U.S.C.A. ξ 3729, the Truth in Lending, 15 U.S.C.A. §1601, and the Federal Home Loan Mortgage, 12 U.S.C.A. §1454. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. sec. 1367. The State law claim in this action arises under Articles 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5141, PR ST T. 31 § 5141, et. sec., and the Constitution of the Commonwealth of Puerto Rico.

1.3.     On October 30, 2015, defendant Capital Title Services and Title Security Group, Inc., filed a Motion for Summary Judgment. See, docket 79. On November 30, 2015, defendants Preferred Mortgage, Jorge Perez Casellas and FirstBank Puerto Rico also filed their respective Motions for Summary Judgment. See, dockets 89, 90, and 92. Plaintiff opposes to the dismissal of this case on the following grounds.

## II.     FACTS OF THE CASE

2.0.   By the end of the year 2012, Plaintiff Castro-Guerra had begun searching for a homestead property to purchase.  Plaintiff was able to locate a detached home with a *garage* at 283 Calle Julio Vizcarrondo, Santurce, Puerto Rico, (see, SAUMF 47) owned by defendant First Bank PR Corporation, (see, SAUMF 70, SAUMF 92), and which was for sale as advertised on their real estate web site. On January 2013, plaintiff Castro-Guerra contacted defendant FirstBank, regarding this property.

2.1.   Plaintiff Castro-Guerra was provided with a detailed appraisal report by defendant First Bank's representative, Adalberto Navarro dated September 12, 2012, that  had been prepared by certified appraiser Marlin Barreto. The intended use of the appraisal report by Marlin Barreto was to be used for a proposed federally related real estate financing transaction to finance the purchase of the property. See, SAUMF 7.

2.2.   In this regard, and pursuant to defendant FirstBank's Engagement Letter of August 12, 2012, defendant FirstBank had retained the professional appraisal services of Marlin Barreto to perform the appraisal on the property at Villa Palmera Julio Vizcarrondo St.  283, San Juan, Puerto Rico. See, SAUMF 141. In said Engagement Letter, defendant FirstBank advised the appraiser that the report must meet several federal standards mentioned therein. See, SAUMF 142. Defendant FirstBank also advised the appraiser that FirstBank owned the requested appraisal report. See, SAUMF 143. Furthermore, in the August 12, 2012's Engagement Letter defendant FirstBank declares that the appraisal report must identify FirstBank as the intended user and that the Appraiser must take all reasonable steps to protect the confidential interests of the Bank and may not divulge any information regarding the process or results of the assignment to any third party other that a duly authorized representative of the Bank. See, SAUMF 144. Defendant FirstBank further advised to the Appraiser that the Bank had a duty to review the Appraisal Report for compliance and the Bank would see that any deficiencies be notified to the Appraiser within thirty (30) days of receipt of the report or resubmissions. See, SAUMF 145.

2.3.   In the Engagement Letter, defendant FirstBank also advises to the Appraiser that during the course of the engagement he might find it necessarily to look to FirstBank for additional direction or clarification to complete the appraiser or to obtain additional information about the subject property not otherwise provided therein. Such information might include, but was not be limited to, the property's intended use, description, ownership, financing, cost budgets, lease information, rezoning or building plans, etc. For these

purposes only, FirstBank considered a dialogue between the appraiser and their lending officer to be appropriate. See, SAUMF 146. The Engagement Letter reflects that the purpose of the appraisal report was to estimate the current value "As Is",   See, SAUMF 147. The property value determination of the property relied on the appraisal report. See, SAUMF 9. In fact, by December 16, 2011, the property had been on sale for the amount of $91,000.00 by FirstBank. See, SAUMF 8.

2.4.   Among others, Marlin Barreto's Appraisal Report stated that the foundation of the dwelling was made of concrete slab. See, SAUMF 128. It stated that the exterior material of the dwelling was concrete, in average condition. See, SAUMF 129. It further stated that the material of interior walls is concrete, in average condition. See, SAUMF 130.

2.5.   On February 5, 2013, Arturo Castro Guerra signed a document with FirstBank through Sky Realty declaring his interest in purchasing the repossessed property located at the Viscarrondo street in San Juan Puerto Rico. See, SAUMF 84. On February 22, 2013, Plaintiff Castro Guerra and defendant First Bank signed a formal "Sale Contract" (Option contract) that reflects Plaintiff's intention to purchase the property as his primary residence (see, SAUMF 90). At that time, Plaintiff provided a deposit of $2,750.00. See, SAUMF 94. The agreed purchase price was $55,000. See, SAUMF 91. In the Option to Purchase Contract executed, Adalberto Navarro Gallardo appeared on behalf of defendant First Bank. See, SAUMF 93.

2.6.   The tenth clause of the "Option to Purchase Contract" stated that during the term of the Contract, the buyer could only have access to the property with the consent and presence of the seller or any of its representatives for the purpose of inspecting the same during the term of the contract and any time before the purchase of the subject property where the buyer is absolutely prohibited from performing any improvements, cleaning jobs, maintenance, installation of locks, or to alter in any way its interior or exterior. Plaintiff *could not*

*make repairs, alter the physical condition, remove interior partitions, knock walls or make any changes to the physical structure of property until the final sale had taken place*. See, SAUMF 85.

2.7.   Afterwards, defendant First Bank PR Corp., referred Plaintiff to defendant Preferred Mortgage indicating that they would process the loan origination with FHA-HUD. Defendant Preferred Mortgage requested an FHA appraisal appointing Adalberto Navarro as the person to coordinate the appointment with the appraiser. See, SAUMF 69. Preferred Mortgage also requested Juan Rivera to conduct an inspection of the property to be sold Plaintiff Castro Guerra. See, SAUMF 71.

2.8.   Mr. Mario Carbia performed another appraisal of the property upon defendant Preferred Mortgage's request. Pursuant to the appraisal report, the total appraisal value of this property on March 2013, was $105,000.00. See, SAUMF 56. The site value is stated as $23,756.00. See, SAUMF 86, and the dwelling value of the property was $93,825.00. See, SAUMF 87. On March 6, 2013, Mario Carbia informed Nery Gonzalez and Arlene Ortiz that he needed a croquis of the property to make a determination as to the concrete walls and roof. See, SAUMF 4. On the same date, defendant Preferred received photos of the property from Mario Carbia. See, SAUMF 3. On March 27, 2012, Mario Carbia sent Preferred Mortgage the appraisal report of the property. The Appraisal Report had an effective date as of March 15, 2013, and February 2, 2916, as the expiration date. See, SAUMF 56.

2.9.   Specifically, Mario Carbia's appraisal report states that the property has a concrete slab foundation. See SAUMF 57. Pursuant to the Appraisal Report, this foundation has no evidence of infestation. See, SAUMF 58. The exterior foundation is reported to be made of reinforced concrete in average condition. See, SAUMF 59. The exterior walls are also reported to be made of reinforced concrete in average condition. See, SAUMF 60. Pursuant to report, the roof of the property is made of reinforced concrete in average condition. See, SAUMF 61. The property seemed to have ceramic floors in average condition. See, SAUMF 62.

The property is reported to have concrete plastered walls in average condition. See, SAUMF 63. Under the section describing the condition of the property it is reported as in need of repairs due to deterioration, renovations or remodeling; it reports that the property has not had any updates during the last fifteen (15) years. See SAUMF 64. The appraisal report reflects that the property has no physical deficiencies or adverse conditions that affect the livability, soundness or structural integrity of the property. See SAUMF 65.

2.10.   In addition, Mario Carbia's appraisal report classified the condition of the property as C4, which means that the improvements feature some minor deferred maintenance and minor deterioration due to normal wear and tear; that the dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetics repairs; all major building components has been adequately maintained and are functionally adequate. See, SAUMF 67. Mario Carbia's appraisal report classified the quality of construction of the property as Q4 which means that, the dwelling with this quality rating meet or exceeds the requirements of applicable building code. Standard or modified building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements; materials workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades. See, SAUMF 68.

2.11.   It must be pointed out that Mario Carbia's appraisal report was intended to be used by Preferred Mortgage Corporation and FHA to support the lender's decision to provide mortgage insurance on the real property which is subjected to the appraisal and served to assist the lender in the underwriting or lending process. See SAUMF 66. Plaintiff was charged the total cost of $350.00 for the Appraisal Report by Mario Carbia & Associates. See, SAUMF 19. The HUD/VA Addendum to Uniform Loan Application for Plaintiff's mortgage loan on this property identifies the application as for insurance under the National Housing Act. See, SAUMF 50.

2.12.   This inspection report falsely states that the house structure and roof are made of concrete, and reinforced concrete. See, SAUMF 148. Plaintiff Castro-Guerra relied mostly on this report to make the decision to purchase the property from defendant First Bank PR Corporation. Plaintiff Castro-Guerra had inspected the property several times and studied the detailed appraisal report for several (about two) weeks before deciding on the purchase.  In sum, the appraisal report from defendant FirstBank PR Corp., contained many details of the property and it indicated that the house structure, the roof, the walls, floors are made of concrete and of reinforced concrete, and also provided listing of comparable properties, valuations and concrete construction. See, exhibit 31.

2.13.   Capital Title made an actualized title abstract on this property for Preferred Mortgage dated April 1, 2013. See, SAUMF 40. The Loan Officer for this transaction was Arlene Ortiz from defendant Preferred Mortgage. SAUMF 1. Gladys Cruz was assigned as the loan processor on February 26, 2013. SAUMF 2. On April 11, 2013, the mortgage loan was approved in the amount of $62,826.00.  See, SAUMF 5. The approved loan included a 203(k) loan. See, SAUMF 6. The 203 (k) Rehabilitation funds approved in this transaction included an additional cost of $1,050.00 in origination and processing fees. See, SAUMF 52. On April 11, 2013, Preferred Mortgage signed a 203(k) maximum mortgage worksheet for the US Department of Housing & Urban Development where the after-improved value of the property is established for the approval of the 203(k). See, SAUMF 96.

2.14.   Prior to the closing, this property had been inspected by defendant First Bank's contract appraiser Marlin Barreto, in September 2012, by FHA inspector Juan Rivera of De Diego Group, by Mario Carbia during March 2013, and by plaintiff Castro-Guerra. Plaintiff was charged the amount of $85.00 for the Survey Fee by Hector A. Rivera (see, SAUMF 26, ); the amount of $100.00 on March 21 2013, for the inspection review to

Preferred Mortgage (see, SAUMF 25, 95); and $300.00 for the repair inspection required by Preferred Mortgage.  See, SAUMF 23.

2.15.   No matter how much effort it was invested, the actual construction material of the house was not detected and the property was believed by Plaintiff to be as described in the appraisal reports. In fact, there was no way to know that the property was not built in concrete unless some parts were taken down. In fact, Plaintiff would have had to remove interior partitions and punch holes on the side of the house to make these discoveries but he could not do so due to the above-mentioned contract's tenth clause by defendants.

2.16.   The above-mentioned tenth clause in the option to purchase contract (see, SAUMF 85) prevented plaintiff Castro-Guerra from becoming aware of the real, actual, worthless condition of the property. Had he known, plaintiff Castro-Guerra would have not purchased the subject property. Defendant First Bank PR Corporation was fully aware that the repossessed property was a wood and zinc property and, as the seller, they knew that plaintiff Castro-Guerra was going to be financing this property with an FHA loan.  It also knew that Plaintiff requested to add an additional amount under the FHA Rehabilitation program funds 203(K), as part of the financing deal to purchase this property.  Unfortunately, the amount approved under the FHA Rehabilitation program funds 203(K) will not even come close to cover the expenses required to rehabilitate the property, and therefore, will never reach the "after rehabilitation appraisal value" considered by FHA when approving the loan.

2.17.   On April 1, 2013, upon defendant Preferred Mortgage's request, defendant Capital Title updated the title abstract on the property eventually sold to plaintiff Castro-Guerra without including any reference as to the construction material of the dwelling. See, SAUMF 114. On this April 1, 2013's title abstract, the property is described as a house on a site owned by Emiliano Rosario Cepeda who bought the same from Luis alfredo Hernandez Garay. See, SAUMF 41. This April 1, 2013's title abstract reveals that the property was subjected to a thirty (30) year mortgage note (loan) in favor to defendant FirstBank while owned by Emiliano Rosario Cepeda.

See, SAUMF 42. This April 1, 2013's title abstract does not state the material with which the property was built and/or made. See, SAUMF 43. The title abstract also reflects that on December 22, 2010, defendant First Bank filed a law suit against Emiliano Rosario Cepeda for failure to make payments on the mortgage loan. See, SAUMF 44. It also reflects that First Bank bought this property back on public auction for the amount of $101,395.15, an amount larger than the original borrowed amount. See, SAUMF 45.

2.18.  On April 30, 2013, Plaintiff Arturo Castro Guerra purchased the real estate property from defendant First Bank. See, SAUMF 102. Notary Public who executed the Purchase Deed was defendant Jorge Perez. See, exhibit 33.

2.19.  Defendant Preferred Mortgage provided an FHA loan to Plaintiff. Plaintiff actually acquired this property with the intent to occupy it as his main or primary residence as he was required to put in writing in order to get the loan approved. See, SAUMF 11. Title insurance was provided by defendant Title Security Group. As part of the settlement services a claim was made for an FHA loan, and title insurance. Title Security Group provided the title insurance policy no. 2955959, in transaction loan 13-5444. See, SAUMF 111. The Loan Policy of Title Insurance issued by First American Title Insurance covers defects in the title. See, SAUMF 110. The property described in page 7 of Schedule A of the Title Insurance Policy only describes the land or site purchased by plaintiff Castro-Guerra. See, SAUMF 109.

2.20.  On April 30, 2013, plaintiff Castro-Guerra was also provided with insurance coverage for this property by Universal Insurance which covers fire, earthquakes and storm loss for specifically concrete dwelling. See, SAUMF 100. The insurance policy issued on this property by Universal Insurance has a coverage limit of $103,920.00, with an annual cost of $247.00. See, SAUMF 104.

2.21.  A thirty (30) year's mortgage loan was approved and executed by Plaintiff through Preferred Mortgage in relation to this the property, on April 30 2013. See, SAUMF 101 and SAUMF 33. Plaintiff's

mortgage loan number 13-5444 is an FHA loan. See, SAUMF 12. The contract sale price on this property remained in the amount of $55,000.00. See, SAUMF 13. The Settlement cost charged to Plaintiff was in the amount of $6,771.88. See, SAUMF 14.

2.22.  The mortgage loan included an additional amount of $7,836.00 for repairs under the 203 (k) federal program. See, SAUMF 15. The FHA 203 (K) Rehabilitation Loan is an FHA insured loan. See, SAUMF 115. The Rehabilitation Loan Agreement signed by borrower (Plaintiff) and the mortgagee (defendant Preferred) on February 25, 2013, in the amount of $8,986.00, was to be kept in an escrow account to be released once the respective repairs had been performed.  See, SAUMF 116. The Rehabilitation Loan Agreement signed by borrower and mortgagee states that if any portion of the proceeds is not used for the repairs, it will be credited to the mortgage loan. See, SAUMF 117.

2.23.  The improvements to be performed on the property object of the 203(k) loan or any changes to the agreed repairs had to be approved by HUD. See, SAUMF 118. Loan proceeds advances shall not be made unless approved by a Direct Endorsement of Underwriter of the Assistant Secretary of Housing-Federal Housing Commissioner, Department of Housing and Urban Development. See, SAUMF 119. If the borrower fails to make payments or to perform any other obligation under the loan, including the commencement, progress and completion provision of the Rehabilitation Loan Agreement and such failure continues for a period of thirty (30) days, the loan shall, at the option of the lender, be in default. See, SAUMF 120. The 203 (K) repairs loan granted to plaintiff Castro-Guerra was based on refunds not advances of monies spent on repairs already approved by FHA/HUD through defendant Preferred Mortgage. See, SAUMF 122. The annual mortgage insurance cost with HUD is in the amount of $765.36, and Plaintiff was charged up front the amount of $1,080.56. See, SAUMF 103. Since Plaintiff never performed the approved repairs, no monies from the escrow account were ever released to Plaintiff.

2.24.  As to the mortgage loan, the gross amount due by borrower was in the amount of $69,607.88. See, SAUMF 16. Plaintiff advanced the amount of $3,523.88 before the closing date. See, SAUMF 17. The total amount due by the borrower on this transaction was $66,084.00. See, SAUMF 18. Among others, Plaintiff was charged, the total cost of $43.00 for the Plaintiff's Credit Report (see, SAUMF 20); the amount of $15.00 for the DO to Fannie Mae (see, SAUMF 21); the amount of $15.00 for the Flood Certification to Flood One (see, SAUMF 22); the amount of $400.00 for the AAA and/or AEE Certifications to Preferred Mortgage (see, SAUMF 24); the amount of $98.17 for the daily interest charges from April 16, 2013 until May 1, 2013 (see, SAUMF 27); the amount of $1,080.56 for the Mortgage Insurance premium to UFMIP-HUD (see, SAUMF 28) the amount of $247.56 for the one year Home Owner's Insurance by Universal Insurance Company (see, SAUMF 29); the amount of $1,430.38 for the Title Services and the Lender's Title Insurance (see, SAUMF 30); the amount of $217.00 for Government recordings charges (see, SAUMF 31); the amount of $112.23 for transfer taxes (see, SAUMF 32). The daily interest charge on the loan of this property is $6.54. See, SAUMF 34. The interest rate on this property applies to the principal, the interest and the mortgage insurance. See, SAUMF 35. The monthly payment on this mortgage loan includes an escrow account charge in the amount of $21.88. See, SAUMF 36. The total cost of the credit in this mortgage loan transaction is $54,069.20. See, SAUMF 37. The monthly payments on this mortgage loan is $376.62. See, SAUMF 38.

2.25.  The mortgage transaction on loan number 13-5444 required a property hazard insurance. See, SAUMF 39. This insurance policy describes the property as a piece of land. The HUD/VA Addendum to Uniform Loan Application for Plaintiff's mortgage loan on this property states that the mortgage loan term is for thirty (30) years. See, SAUMF 49. See, SAUMF 49. In the Conditional Commitment Direct Enforcement Statement of Appraised Value, Preferred Mortgage stated that the Estimated Remaining Economic Life of this property is

forty-five (45) years. See, SAUMF 88. The HUD/VA Addendum to Uniform Loan Application clearly states that Federal laws provide severe penalties for fraud, misrepresentation or conspiracy to influence wrongly the issuance of mortgage insurance by HUD. See, SAUMF 89. On April 30, 2013, Plaintiff Castro-Guerra subscribed a sworn statement, affidavit no. 19,625, before defendant Perez where it states that the dwelling is a concrete structure; the "wood" box was not even selected. See, SAUMF 112. Defendant Jorge Perez Casellas received a payment at least in the amount of $340.00 for his services as notary public related to the transaction, See, exhibit 33, and SAUMF 107. Defendant Perez authorized First Bank's representative, Adalberto Navarro to receive on his behalf the check issued in payment for his attorney fees and costs, related to the April 30, 2013's transaction described in the complaint. See, SAUMF 105. After the closing, the administration and service of loan 13-5444 was transferred to Banco Popular de Puerto Rico on May 13, 2013. See, SAUMF 108.

2.26.  Shortly after the closing, Plaintiff was ready to commence the remodeling project on the property using the 203(k) funds. Plaintiff Castro-Guerra had hired construction worker Christopher Napoleon to remove, inter alia, the interior partitions of the house and the entire acoustic ceiling of the house. Accordingly, on March 12, 2013, construction worker Napoleon had submitted an estimate for labor only to remove the interior partitions of the property during the repairs already approved and to be performed on the property. See, SAUMF 72.

2.27.  Napoleon started with the repairs and around ten (10) days after the closing the construction worker notified plaintiff Castro-Guerra that upon removal of interior partition inside the house, the worker had discovered that the property was in fact constructed of wood walls and a zinc roof plastered with cement, all with heavy termite infestation on the wood. The weight of the roof is being supported by only <u>one</u> (1) infested wood beam. The roof structure is extremely unsafe, in heavy deterioration and under danger of collapsing. The

house structure is <u>unrepairable</u> and requires <u>demolition</u>. It was then that Plaintiff learned that he had not bought what he was told he was buying.

2.28.   On May 10, 2013, Plaintiff personally informed Preferred Mortgage about his discovery. On the same date, Nery Gonzalez sent a Fax to Juan Rivera where it is acknowledged that Plaintiff had informed that the property was not built with concrete. SAUMF 55. On May 2013, Plaintiff also sent a letter to Preferred Mortgage specifically stating that upon removal of wood interior portions in the property Plaintiff had become aware that the roof was made of wood and zinc which is inconsistent with both the appraisal report provided to plaintiff Castro-Guerra by defendants. See, SAUMF 121.

2.29.   On July 2, 2013, plaintiff Castro Guerra informed Preferred Mortgage through Nery Gonzalez via email that an FHA inspector had inspected the property and also restated that the property was made mostly of wood and zinc. See, SAUMF 53. After been informed that this property was made mostly of wood and zinc, Nery González continued sending emails to Plaintiff in order to schedule a meeting to discuss the scheduled repairs of the property as if the new discovery was of no consequence. See, SAUMF 54. During the process, Castro-Guerra had stored several newly purchased windows and doors for the scheduled repairs which were taken from the property without Plaintiff's authorization by employees from defendant FirstBank's Maintenance Company and were never returned. See, SAUMF 148.

2.30.   Notwithstanding, defendant FirstBank alleged that because Plaintiff was not authorized to store anything in the property, the loss of the windows and doors were his loss. To this regards, a claim was filed with the Puerto Rico Police Department. Plaintiff has never been granted any relief from defendants of the Puerto Rico Police Department regarding the loss of the materials and/or the fraudulent transaction. To this date, Plaintiff continues making monthly payments on the mortgage loan while deprived of his own place to live due to the condition of the property.

2.31. Given the situation above-described, Plaintiff began searching for additional information regarding this property. On September 12, 2013, Plaintiff Castro-Guerra met with Nery Gonzalez from Preferred Mortgage, and explained to Gonzalez that the Edification Act registered at the Property Registry stated that the property sold to Plaintiff was in fact a wood and zinc house, and therefore, it was irreparable, reason why he had no intention to use the repairs funds which should remain in his escrow account. See, SAUMF 76. During the meeting, Plaintiff further informed that no repairs were to be performed to the property and requested that a HUD's representative inspected the dwelling. Furthermore, Plaintiff handed five (5) photos of the wood and zinc construction of the dwelling and a copy of the Edification Act dated November 25, 2005. See, SAUMF 77 and SAUMF 123. It must be noted that during the proceedings of the above-captioned case, counsels for Plaintiff, Capital and Title, and FirstBank went during the month of October 2015, to the site and personally saw the real construction of the dwelling as shown in exhibit 53 and the first two photo shown in exhibit 68.

2.32. Pursuant to the Edification Act of November 25, 2005, the structure or dwelling did not belong to the seller. See, SAUMF 78. Notwithstanding, during the process prior to approving a mortgage loan by defendant FirstBank to previous owner of the property on November 29, 2005, an Edification Act was executed to reflect the dwelling laid on the lot. See, Edification Act No. 78 of November 29, 2005, as exhibit 26. The wood house was fully exposed and visible. The notary public personally went to this property and observed a *900* sq./ft. house made of wood, with a zinc roof. See, SAUMF 80. Plaintiff found out that somewhere around November 29, 2005, defendant First Bank PR Corp., had retained a notary public to prepare an Edification Act to make a record that a dwelling was located on the site. See, exhibit 26. The Edification Act and the Purchase Deed for the previous owner were executed by the same notary public. See, SAUMF 79. For no legal apparent grounds, the Edification Act changes the description of the dwelling eliminating the statement that the dwelling is made of wood, zinc, and concrete slab. See, SAUMF 81. Two weeks later on December 16, 2005, this property

was apparently sold by Luis Alfredo Hernandez-Garay to Emiliano Rosario-Cepeda for the amount of $90,000.00. Defendant First Bank PR Corp., provided the mortgage loan in the amount of $88,200.00 to Rosario-Cepeda. See, exhibit 26.

2.33. On December 30, 2005, the Edification Act, the purchase contract and the mortgage loan were all recorded as journal entries #972, #973 and #974 by attorney Frederick James Baraga Huyke, from the Latimer Biaggi Law Firm, which was at all relevant time an outside legal counsel for defendant First Bank Corp. See, exhibit 27. There is no house structure recorded on this lot at the property registrar or in the property tax agency known as CRIM. See, SAUMF 48.

2.34. On December 16, 2005, Luis Alfredo Hernandez Garay sold the land and dwelling on the land to Emiliano Rosario Cepeda. See, Purchase Deed of December 16, 2005. See, SAUMF 82. Emiliano Rosario Cepeda was granted by FirstBank a thirty (30) years mortgage loan on this old wood, zinc, and concrete dwelling. See, SAUMF 83 and See, SAUMF 98. During the life of Rosario Cepeda's loan, he received three (3) credits. See, SAUMF 99. Defendant FirstBank purchased the property on public action for $101,395.15.  See, SAUMF 97.

2.35. The Property registry reflects the following:

> ..."Guaranteeing the following additional credits: Three credits equivalent to 10% of the principal are guaranteed for costs, expenses and attorneys' fees; for interests in addition to those guaranteed by law; and to cover any advance that may be made under this contract. This plot is appraised at an amount equivalent to the principal. CONDITIONS: ***The mortgage is made extensive to any improvement, new construction or building that is introduced on the property. The mortgage debtor waives his right to homestead..***  See, SAUMF 27.

2.36. Upon further inquiry and as result of this process, Plaintiff Castro-Guerra has learned more about the background of this property and the many problems and/or legal deficiencies it entails. Plaintiff has learned that on July 30, 1968, Samuel Ruiz Domenech and his wife Evelyn Valentin sold the dwelling to Dolores Gonzalez widow of "de Clotilde" Zayas Quiñoñes. In the deed, the dwelling is described as a wood, zinc and concrete

structure built on the land which belonged to Julio Margarida. See, Purchase Deed No. 18 of July 30, 1968. See, SAUMF 133. On April 15 1997, purchase deed No. 23 was executed whereas Rafael Margarida Umpierre sold the property to Luis Alfredo Hernandez Garay but the signatures appearing in the deed are those of Dolores Gonzalez Vuida de Zayas c/p Dolores Gonzalez Nazario and Luis Alfredo Hernandez Garay, not Rafael Margarida. See, Purchase and Segregation Deed No. 23, of April 15 1997. Also, is unknown how Rafael obtain the land that was owned by Julio Margarida. The chain of ownership is faulty. See, SAUMF 135. On April 15, 1997, Dolores González Viuda de Zayas, also known as Dolores González Nazario, sold the dwelling to Luis Alfredo Hernandez Garay. See, Purchase Deed No. 24 of April 15 1997. See, SAUMF 134.

2.37. On October 10, 2005, and also, on November 9, 2005, The Title Security Group had already preformed two (2) title search on the property at Villa Palmera Julio Vizcarrondo St. 283, San Juan, Puerto Rico, which reflected that dwelling on the land did not belong to the owner of the seller. See, SAUMF 140. On December 29 2011, JGT title Abstract performed a title search on the property at Villa Palmera Julio Vizcarrondo St. 283, San Juan, Puerto Rico, which reflects that FirstBank filed a civil action to repossess the property for failure to make payments on the mortgage loan, and therefore, defendant FirstBank acquired the property by means of an action sale. Furthermore, Capital Title filed another title search on December 14, 2005 which reflects that structure does not belong to seller (Garay). The December 2005 real estate transaction between Rosario Cepeda and Garay had ownership defects regarding the house structure. See, SAUMF 138 and 139.

2.38. On September 15, 2013, Plaintiff Castro-Guerra sent a letter to Preferred Mortgage through Nery Gonzalez requesting an extension of time for the repairs disbursement of the 203 (K) loan and explained that the property sold to Plaintiff was a wood and zinc house which could no hold the scheduled repairs. See, SAUMF 75. On October 3, 2013, Preferred Mortgage sent Juan C. Sola from HUD, a copy of the status loan, Appraisal Report, 203 (K) contracts, and plaintiff Castro-Guerra Letter dated September 15, 2013. See, SAUMF

124. At all relevant times, Juan C. Sola, MAA, was an Appraiser for the Technical Support Branch of U.S. Department of HUD and Processing and Underwriting Division for the Atlanta Homeowner Center, who on October 21, 2013, informed Preferred Mortgage that due to the borrower's claim, additional research needed to be done. See, SAUMF 125.

2.39.  As result of the delay in performing the repairs under the 203 (K) loan, on December 6, 2013, the U.S Department of Housing and Urban Development sent a letter to Preferred Mortgage informing that the deficiency in this loan was material and exposed the Department to an unacceptable level of risk. See, SAUMF 126. The December 6 2013's letter from HUD to Preferred Mortgage Corporation refers to a "Request for Loan Indemnification" being negotiated. See, SAUMF 74. On March 11, 2014, defendant Preferred Mortgage Corporation signed an Indemnification Agreement with HUD regarding Plaintiff's mortgage loan. See, SAUMF 73. On April 7, 2014, the U.S Department of Housing and Urban Development sent Preferred Mortgage a communication regarding a request for Loan Indemnification which included an executed *Indemnification Agreement*" with regards to Plaintiff's 203 (K) loan, which makes reference to the QAD File Number: 46829. See, SAUMF 127.

2.40.  On the other hand, the Property Registrar's Office shows that on April 15, 1999, Luis Alfredo Hernandez-Garay had originally purchased this site for the amount of $6,000.00. See, exhibit 27. By then, there was _no_ record of a house structure at this property. See, exhibit 27. There _is_ _no_ house structure recorded on this lot at the property registrar or in the property tax agency known as CRIM. See, exhibit 46. According to the Uniform Residential Loan Application, the land Plaintiff purchased was not acquired separately from the structure. See, SAUMF 10. At the CRIM, by April 16, 2013, the property is registered as a piece of land valued on $1,500.00, and as to the structure appears with no value at all. Furthermore, on June 2014, both Notary Casellas and Carlos Saltz Bakahalar filed documents with Property Records which describe this transaction as a

"MORTGAGE OVER THIS PLOT", This description does not reflect the transaction signed by Plaintiff on April 30, 2013 at the office of Preferred Mortgage with Notary Casellas. Plaintiff asserts that not only was the description of this transaction altered one year later, but also, the legal description was altered by both Notary Casellas and Preferred Mortgage one year later. The house structure has been completely removed from this transaction with only mention on a "Plot of Land".   See, SAUMF 106; Exhibit 27.

2.41.   On August 12, 2014, Plaintiff Arturo Castro-Guerra notified the United States Attorney, Rosa Emilia Velez, regarding the filing of the above-captioned complaint along with by copy of the above captioned complaint. See, SAUMF 131. To this date, the inscription of the site or land appears registered to the name of Plaintiff Castro-Guerra Property registry while no mention is made of the dwelling. See, See, SAUMF 132. On December 14, 2015, Plaintiff sent a letter to loan servicing bank, Banco Popular requesting that they rescind or revert the April 30, 2013, purchase transaction regarding this property which is a remedy TILA provides if filed within the term of three years from the purchase. See, SAUMF 150.

### III.   LEGAL STANDAR FOR SUMMARY JUDGMENT

3.0.   Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Grajales v. P.R. Ports Auth.*, 924 F. Supp. 2d 374, 378-379 (D.P.R. 2013) (citing, Fed.R.Civ.P. 56(a)). "An issue is genuine if it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citations omitted).

3.1.   The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), with definite and competent evidence, see *Maldonado-Denis v. Castillo-Rodríguez*, 23 F.3d 576, 581 (1st Cir. 1994). It must clearly identify

"portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" which support its motion. Id. (citing Fed.R.Civ.P. 56(c)).

3.2.   If the moving party overcomes this initial burden, then the burden shifts to the nonmoving party "to demonstrate that a trier of fact reasonably could find in [its] favor." *Santiago Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted). If the non-moving party establishes uncertainty as to the "true state of any material fact, the movant's efforts should be deemed unavailing." See, *Lopez & Medina Corp. v. Marsh USA, Inc.*, 694 F.Supp.2d 119, 123 (D.P.R. 2010) (citing *Suarez v. Pueblo Int'l.*, 229 F.3d 49, 53 (1st Cir. 2000)). That is, if some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. *Martinez-Rodríguez v. Guevara*, 597 F.3d 414, 419 (1st Cir. 2010) (citing, Anderson, at 248).

3.3.   The non-moving party "must present definite, competent evidence to rebut the motion". *Maldonado-Denis v. Castillo Rodríguez*, 23 F.3d 576, 581 (1st Cir. 1994) (internal citation omitted). "As we have said many times, summary judgment is not a substitute for the trial of disputed factual issues." *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 178-179 (1st Cir. 2011) (internal quotations and citations omitted). Importantly, in its analysis the Court must take the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 779-80 (1st Cir. 2011), and does not "make credibility determinations or weigh the evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…"); "[T]he ground rules for summary judgment leave 'no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be)' on the cold pages of the record." *Rodríguez*,

659 F.3d at 175 (1st Cir. P.R. 2011) (quoting, *Greenburg v. Puerto Rico Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987)).

3.4.    Moreover, summary judgment is inappropriate where, as here, there are issues of motive and intent as related to material facts. *Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 470, 473 (1962) (summary judgment is to be issued "sparingly" in litigation "where motive and intent play leading roles"); *Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) ("findings as to design, motive and intent with which men act [are] peculiarly factual issues for the trier of fact."); see also *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000) (finding that "determinations of motive and intent . . . are questions better suited for the jury"); *Mulero Rodríguez v. Ponte, Inc.*, 98 F.3d 670, 677 (1st Cir. 1996) (reversing summary judgment and noting that "determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury" (internal quotation marks and citation omitted)). Indeed, the First Circuit has explicitly held that the test for granting summary judgment is "particularly rigorous when the disputed issue turns on a question of motive." *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir.1988).

## IV.    LEGAL ARGUMENTATION

### A.    FALSE CLAIM ACT, 31 U.S.C.A. § 3729, ET. SEQ.

4.0.    Plaintiff incorporates by reference ¶¶ 2.0 to 2.39, as if fully realleged herein.

4.1.    False Claims Act (FCA) is a statutory scheme designed to discourage fraud against the Federal Government. 31 U.S.C.A. §3729(a*). Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 31 I.E.R. Cas. (BNA) 1092 (4th Cir. 2010). It was promulgated during the American Civil War at the insistence of President Abraham Lincoln, in an attempt to curb fraud by private contractors. "*False Claims Act Title*", 31 U.S.C. Ch. 37 - 78 Am. Jur. *Proof of Facts* 3d 357 (Originally published in 2004); *Proof of Violation under the False Claims Act*, James W. Adams, Jr., B.S., J.D., American Jurisprudence *Proof of Facts* 3d, Database updated April 2014.

4.2.    The False Claims Act provides for two essential elements necessary to prove a cause of action:

(1) that the claim for payment from the government was made; (2) that the claim was false or fraudulent. To establish prima facie violation of False Claims Act (FCA), plaintiff must prove that: (1) defendant presented or caused to be presented to agent of United States claim for payment; (2) claim was false or fraudulent; (3) defendant knew claim was false or fraudulent. 31 U.S.C. App. (2006 Ed.) § 3729 (a)(1). U.S. ex rel. *Wilkins v. United Health Group, Inc.*, 659 F.3d 295 (3d Cir. 2011).

4.3.    Reckless disregard is sufficient for False Claims Act (FCA) liability because a specific intent to defraud is not required under the FCA. 31 U.S.C.A. §3729(a)(1), (b)(2)(A)(i), (b)(2)(A)(ii)(II). *U.S. v. Medquest Associates, Inc.*, 702 F. Supp. 2d 909 (M.D. Tenn. 2010). And, no proof of specific intent to defraud is required to establish claim for civil penalty under False Claims Act (FCA). 31 U.S.C.A. §3729(a)(1); *Hernandez, Kroone and Associates, Inc. v. United States*, 110 Fed. Cl. 496 (2013).

4.4.    False Claims Act (FCA) generally permits the federal government or a party suing on the government's behalf to recover for false claims made by the defendants to secure payment by the government. 31 U.S.C.(2006 Ed.) § 3729(a)(1, 2). *U.S. ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 903 F. Supp. 2d 473 (E.D. Tex. 2011). A "claim" need not be made directly to the government for liability to attach under provision of False Claims Act imposing civil liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or **approval**"; it may include a request or demand that was originally made to a contractor, grantee, or other recipient of federal funds and then forwarded to the Government. 31 U.S.C. (2006 Ed.) § 3729(a)(1). *U.S. v. Hawley*, 619 F.3d 886 (8th Cir. 2010). Submission of false or inaccurate information constitute a violation whether the submission of a claim actually causes the government any damages. Under this standard, the submitter of a false claim should be liable for those damages which arise because of the falsity of the claim. See, 31 U.S.C.S. §3729, et. seq.

4.5.    Liability under False Claims Act (FCA) based on "**implied certification theory**" requires that relevant statute or regulation expressly state that compliance with particular requirement is precondition of

payment. 31 U.S.C.A. §3729(a). *U.S. ex rel. Westmoreland v. Amgen, Inc*., 707 F. Supp. 2d 123 (D. Mass. 2010). Under the "implied false certification" theory, a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment; under either an express or implied false certification theory, to plead a claim a plaintiff must show that compliance with the regulation which the defendant allegedly violated was a condition of payment from the government. 31 U.S.C. App. (2006 Ed.) §3729(a)(2). To establish False Claims Act (FCA) liability under an "implied certification theory", the plaintiff must prove that compliance with the legal requirement in question is material to the government's decision to pay; that payment was conditional on compliance with the requirement at issue. 31 U.S.C. App. (2006 Ed.) § 3729(a)(1). *U.S. v. DRC, Inc*., 856 F. Supp. 2d 159 (D.D.C. 2012).

4.6.    Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations, which are prerequisites to Government payment in connection with the claim for payment of federal funds. *United States of America, and State of New Mexico, ex rel. v. Deming Hospital Corporation*, 992 F.Supp.2d 1137 (2013). It is a claim of legal falsehood, generally premised on an allegation that the defendant "certified[d] compliance with a statute or regulation as a condition to government payment, yet knowingly failed to comply with such statute or regulation." *See, Conner*, 543 F.3d at 1217 (citing *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir.2001)). "Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment." *Conner*, 543 F.3d at 1220.

4.7. There is a more expansive version of the express false certification theory called "implied false certification" liability which attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment. *Id*. Thus, an implied false certification theory of liability is premised "on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."

*Mikes*, 274 F.3d at 699; see also, *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C.Cir.2010);

*U.S. ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295 (2011).

4.8.    Under a fraudulent inducement theory, although the defendant's subsequent claims for

payment made under a government contract were not literally false, because they derived from the original

fraudulent misrepresentation, they, too, become actionable false claims, under the False Claims Act (FCA). 31

U.S.C.A. §3729(a), (b). *U.S. ex rel. Longhi v. U.S.*, 575 F.3d 458 (2009).

4.9.    The FCA attaches liability, not to the underlying fraudulent activity or to the government's

wrongful payment, but to the "claim for payment". Indeed, a contractor who submits a false claim for payment

may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to

request for reimbursement for goods or services never provided", *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir.

2011). On the other hand, a "legally false" certification gives rise to liability "only when a party affirmatively and

explicitly certifies compliance with a statute and certification is a condition to receiving the government benefit",

*United States v. Americus Mortg. Corp*, 2014 US Dist. LEXIS 121572, Aug. 29, 2014.

4.10. To plead the requisite level of scienter under the FCA, plaintiff must establish (1) actual knowledge

of falsity, (2) defendant acted with deliberate ignorance of the truth or falsity of the information provided, or

(3) acted with reckless disregard of the truth or falsity of the information provided. *Longhi*, 575 F. 3d at 468; *US

ex rel. Willard v. Humana*, 336 F.3d 375, 385 (5th Cir. 2003); *United States v. Americus Mortg. Corp*, 2014 US

Dist. LEXIS 121572, Aug. 29, 2014. To plead materiality, the false statements or fraudulent conduct were

"*material*", the Government must allege facts establishing that the statements or conduct had a "natural

tendency to influence", or [are] capable of influencing, the decision making body to which it was addressed",

*Longhi*, 575 F 3d at 468 (citing *Neder v United States*, 527 US 1, 16, 119 S.Ct. 1827, 144 L. Ed. 2d 35 (1999). The

Fifth Circuit has adopted a relaxed interpretation of the natural tendency test. "All that is required under the

test for materiality, false or fraudulent statements have the potential to influence the government's decision."

*Id.* At 470; *United States v. Americus Mortg. Corp*, 2014 US Dist. LEXIS 121572, Aug. 29, 2014.

4.11.    A plaintiff asserting a FCA 3729 (a)(2) claim must prove that the defendant intended that the false record or statement be material to the government's decision to pay or approve the false claim. A §3729(a)(2) claim therefore does not require a plaintiff to plead the facts as to the specific element of a false claim with particularity. To plead a claim under 31 U.S.C.S. §3729(a)(2) in a manner that satisfies Fed. R. Civ. P.9 (b), the relators must allege with particularity that the defendant's false statements ultimately led the government to pay amounts it did not owe., they must allege that the government payment of a false claim occurred, *United States ex rel. Bibby v. Wells Fargo Bank*, N.A., 906 F. Supp. 2d 1288, Nov 19, 2012; Matheny, 671 B.

4.12.    Defendant Preferred Mortgage filed a claim for an FHA/HUD loan and received the payment in the amount of this loan. The application to qualify the subject property for the mortgage and rehabilitation loan by itself establishes the false claim under the FCA. As defendant Preferred Mortgage very well alleged in its motion for summary judgment, Fannie Mae and Freddie Mac, as well as others, are federally chartered corporations that own or guarantee a substantial portion of the mortgages on single family homes in the United States to increase liquidity of the mortgage market and promote access to credit. In order to have access to such credit, Mortgages institutions submit applications for loans that federal government purchase and retain or insure. Either way, federal funds are at risk. Any false material information which causes the approval of any federal mortgage loans falls under the prohibition of the FCA.

4.13.    In Plaintiff Castro-Guerra's case, the application for the federal mortgage loan included the appraisal of the property which in turn contained false information as to the real material of this property, affecting its appraisal value used for the approval of the federal loan. Defendant FirstBank had a duty to provide the appraiser with the relevant information to assist the appraiser to make the true and correct assessment on

the property. Even though defendant FirstBank knew about the material of the property because he had provided financing in the year 2005, it did not request the correction. Instead, it chose to conceal the information so that a federal loan be approved in order to sell this property to Plaintiff.

4.14.    Defendant Preferred Mortgage either knew about the condition of this property or was grossly negligent and acted in reckless disregard of the truth when it designated a representative from FirstBank, Adalberto Navarro, to coordinate the preparation of the second Appraisal Report performed upon Preferred Mortgage's request. Also, it was defendant Preferred Mortgage who submitted the request for a federal mortgage loan and all documents considered by the federal government in the process of evaluation the mortgage loan request. This mortgage loan was approved by federal government in consideration to the improvements that were going to be performed in the property and the after-rehabilitation value of the property.

4.15.    When Plaintiff made the decision to purchase the property he relied on the appraisal reports. Due to the tenth clause of the Option Contract, Plaintiff could not have learned that this property was not as described in the appraisal reports, but only after the closing of the transaction. Plaintiff Castro-Guerra had submitted to defendant Preferred all documents regarding the scheduled repairs that were going to be performed in the property based on the cost of updating a concrete property. The approval of the rehabilitation loan was based on this information when it approved the loan.

4.16.    From the record can be gathered that the appraisal report along with many other documents were submitted to the federal government for the approval of the mortgage loan.   In the case of the rehabilitation loan, the federal government qualified the property for the approval of the loan. The appraisal is considered for the approval of the loan. If the information is faulty, it induces to a determination which otherwise would not have been reached. For instance, when the mortgage loan was approved for the property Plaintiff purchased, the rehabilitation loan was granted in consideration of the after-rehabilitation value which the

property is never going to reach because the improvements that the "wood and zinc" house needs cannot be performed with the estimated amount of the loan approved. Therefore, an Indemnification Agreement was subscribed between the Federal Government and defendant Preferred to mitigate actual or potential losses arising from this transaction.

4.17.    Notary Public Jorge Perez prepared the Purchase Deed and acted as notary public in this transaction. He had a legal duty to ensure that the document contained all material information to comply with legal requirements for the transaction. In *In re Melendez Perez*, 1976 DPR Sup. Lexis 2236, the Supreme Court of the Commonwealth of Puerto Rico explained that in Puerto Rico since 1906, only an attorney can be notary public. This was established in order to strengthen the notary field with the intellectual resources of Law and to enrich their social function making available to society notary publics who are also knowledgeable of the law. A notary public <u>is not</u> a simple observant of the legal business being executed before him. His roll is not limited to verify the identity of the parties and the authenticity of the signatures. His function is of public nature and transcend beyond the legality of the transaction being executed. See, *In re Melendez Perez*, 1976 DPR Sup. Lexis 2236.

4.18.    The Purchase Deed contained the description of the property object of the sale but the Mortgage Note did not. Defendant Perez had available his client's file (FirstBank) which contained the Edification Act which defendant FirstBank had prepared and registered in the Property Registry in the year 2005, just before providing a mortgage loan to previous owner, Rosario Cepeda. Defendant Perez had a duty to include in the Purchase Deed a full description of the property as material information for the transaction. Federal Government do not finance properties without inquiring as to the material of the property since this information is material to the approval of the loan. Defendant Casellas knew that the legal description was incomplete and that an Edification Act had been registered. He had a duty to further inquire to obtain all material information that was missing for the transaction to be executed but, even if he was to argue that he did not know the truth, he acted

reckless disregard of the truth omitting the fact that the dwelling was made of wood and zinc giving way a false claim and a fraudulent transaction for Plaintiff and the federal government.

4.19.    On the other hand, the Property Registry included as exhibit 27, shows there is a gap in the title chain which make it faulty. There is no transaction registered showing how Hernandez-Garay validly became owner of the site sold to Plaintiff. As a matter of fact until the 2005, all title abstracts performed on this property showed that the dwelling did not belong to the seller. Defendant Perez should have alerted Plaintiff about this fact. Also, defendant Preferred Mortgage obtained a title abstract for this transaction which should have reflected this fact, as well as defendant FirstBank prior title abstracts. Interestingly enough, the record shows that as soon as FirstBank intended to provide financing for this property, al mention of the material of the property was concealed, in the property formal description change in the Edification Act and in the property abstracts.

##### B.    REAL STATE SETTLEMENT PROCEDURE ACT, ALSO KNOWN AS "RESPA"

4.20.    Plaintiff incorporates by reference ¶¶ 2.0 to 2.39, as if fully realleged herein.

4.21.    Section 2602, 12 USCA § 2602(1(B)(iii) of the Real Estate Settlement Procedures Act (RESPA) regulates mortgage loan transaction. A federally related mortgage includes any loan which is secured by a first or subordinate lien non-residential real property that is intended to be sold by the originating to the Federal National Mortgage, Government National Mortgage Association, or the Federal Home Loan Mortgage Corporation. Under RESPA, Settlement Services include any service provided in connection with a real estate settlement transaction including, but not limited to, title searches, title examinations, title certificates, title insurance services, services rendered by an attorney, in loan processing.

4.22. Title Search is an examination of the public records to determine whether any defects or encumbrances exist in a given property's chain of title. A title search is typically conducted by a Title Company or by a real estate lawyer. It examines real estate titles for any encumbrances, claims or to her flaws and issues

title insurance. A defective title is one that cannot legally convey the property to which it applies, also termed bad title. It is of course beyond question that an abstracter employed to compile an abstract or bring one down to date will become liable if the work done fails to satisfy the express or implied terms of the undertaking. Moreover, the generally prevailing doctrine appears to be that the duties and liabilities of the abstracter to his employer are purely contractual, (28 A.L.R.2d, 891) except, necessarily, as he may be guilty of some collateral or independent tort or fraud. See, *Roberts v. Leon Loan & Abstract Co.* (1884) 63 Iowa 76, 18 NW 702.

4.23. An abstracter or one who holds himself out as an abstracter, impliedly represents that he has the requisite degree of skill to perform duties required of an abstracter, and when employed to examine and report land title, he is required to use a reasonable standard degree of skill and care. *Breck v Moore*, 910 P 2d 599 (Alaska 1996); *Garton v. Title Ins. & Trust*, 165 Cal. Rptr, 449 (3d Dist. 1980). His duty is to examine the records affecting the land dealt with and to prepare an accurate and reasonably sufficient abstract thereof covering the period to be shown. The duty is to examine the recorded documents at length and to truly report their contents.

4.24. A person undertaking to make an abstract assumes the responsibility of discharging the duty in a skillful and careful manner. His duty is to furnish facts from the record without concern for their legal effect, in order to enable his employer (and the notary public) to make his own examination and determine for himself what the records show. "If he makes a mistake or oversight or omission, resulting in damages," he must respond accordingly. *Stephenson v. Cone* (1910) 24 SD 460, 124 NW 439, 26 LRA NS 1207. The undertaking implied by law on the part of one engaging in the business of furnishing abstracts for compensation is that he will use due and ordinary care in the performance of his duties. For a failure to do so, resulting in damages, he is liable to the party with whom he bargains. *Chase v. Heaney*, (1873) 70 Ill 268.

4.25.    An abstract means a statement, in substance, of what appears on the public records affecting the title to the property." *Union Safe Deposit Co. v. Chisholm* (1889) 33 Ill App 647. In a legal sense, an abstract of title is a "summary or epitome of the facts relied on as evidence of title," and must contain a note of all

conveyances, transfers, and other facts relied on as evidences of the title, together with all such facts appearing

of record as may impair the title, and should contain a full summary of all grants, conveyances, wills, and all

records and judicial proceedings whereby the title is in any way affected, and all encumbrances and liens of

record, and show whether they have been released or not. *Heinsen v. Lamb* (1886) 117 Ill 549, 7 NE 75; *Attebery*

*v. Blair* (1910) 244 Ill 363, 91 NE 475, 135 Am St Rep 342; *Geithman v. Eichler* (1914) 265 Ill 579, 107 NE 180. 4.7.

4.26. Furthermore, it is one of the duties of an abstracter to read in its entirety a deed appearing of

record and affecting the land abstracted and to show upon the abstract all matters appearing from such deed

and called for by the abstracting contract. Lee, *Lumber Co. v. Hetherwick Title Co.* (1926) 160 La 978, 107 So 772.

The fair and reasonable import of the contract of one undertaking to make an abstract of title is such as to

obligate him to make a full and true search and examination of the records relating to the title of the land, and

accurately to note upon the abstract every transfer, conveyance, or other instrument of record in any way

affecting the title. The record of the instrument itself and not merely a marginal reference to it made by the

registrar must be examined and the true character and purport of the instrument noted on the abstract. *Wacek*

*v. Frink* (1892) 51 Minn. 282, 53 NW 633, 38 Am St Rep 502.

4.27. In *Equitable Building & Loan Ass'n v. Bank of Commerce & Trust Co.*, 10 Cates 678, the Supreme

Court held that where an abstract of title contained a certificate that it contained all conveyances as shown by

the records in the register's office and the body of the abstract referred to a will as part of the chain of title, as

shown by a will book which was required to be kept in the county clerk's office, the contract for the abstract

must have included the will. There is a duty on a subsequent purchaser and title abstracter to examine the copy

of a recorded document and not rely solely on information in the indexes. M.S.A. § 507.34. *Mid Country Bank*

*v. Krueger*, 782 N.W.2d 238 (Minn. 2010). Abstracter undertaking to examine title to real estate has same duty

to employer as attorney has to client, and is liable for negligence in making search which fails to reflect defect

in title. *Sandler v New Jersey Realty Title Ins. Co.* (1961) 66 NJ Super 597, 169 A2d 735, revised on other grounds 36 NJ 471, 178 A2d 1.

4.28. In determining whether that standard has been met, the common practice of the abstracting business or occupation may be considered, but it is still the standard of what an ordinarily prudent man would do that governs. The common practice of examining the judgment index only, held not reasonably diligent. *Wichita Great Empire v. Gingrich*, 4 Kan. App. 2d 223; 604 P.2d 281(1979). There is a duty to investigate documents properly recorded or docketed, and to accurately or truly report their contents; *Miller v Title Ins. Co.*, 199 MT 230; 987 P.2d 1151 (1999); *Viotti v Giomi*, 230 Cal. App. 2d 730.

4.29.    Ordinarily, the question whether the abstracter has used reasonable care is to be resolved as a question of fact, but failure to examine the original records is negligence as a matter of law, *Wacek v Frink, 51 Minn*. 282; 53 NW 633 (1892). So far, as an abstracter assumes to describe instruments of record, due care and skill require that such description be accurate, *JH Trisdale v Shasta County Title Co*, 146 Cal App 2d 831, 304 P2d. 832 (3d Dist. 1956). A proper title search includes examination of the grantor-grantee indices and a party conducting a title search of a piece of property should use all available public facilities, including a parcel identification index, used by other abstracters in the community as backup in their searches. *Eltman v Harvey*, 93 Misc. 2d 634, 403 NYS 2d 428 (Supp. 1978) (holding that the duty of the abstracter is not fulfilled by assuming the accuracy of a marginal reference made by the register to the effect that a mortgage is discharged; he must examine the instrument of discharge).

4.30. On the other hand, Title Insurer (in this case, Title Security Group) does not guarantee the state of the title but agrees to indemnify the insured for any loss. The term "Title Company" means any institution which is qualified to issue title insurance, directly or indirectly through its agents, and also, refers to any duly authorized agent of a title company. 12 USCA §2602 (1)(B) (4). Real Estate Settlement Procedures Act (RESPA) applies to those loans which are federally related mortgage loans.  12 USCA § 2610; Truth in Lending Act (TILA),

15 USCA §1601 et. al. A mortgagor has standing to bring claim against Title Company for violation of RESPA section; as part of a real estate settlement service base on mortgagors' payment to business afflicted with Title. A title insurance is designed to save him harmless from any loss through defects, liens, or encumbrances that may affect or burden his title when he takes it. *Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 781 (6th Cir. 1986).

4.31. When a title policy is issued to an owner, failure of a policy to disclose title defects or liens can adversely affect the property owner because the owner is entitled to full market value of the property and that value is immediately reduced by any outstanding defects in title. *American Jurisprudence* 2d, § 518, p. 619. Real estate includes not only the land itself but also all buildings, fixtures and improvements and the rights and privileges appurtenant. *In re Hodes*, 402 F 3d 1005, 2003.

4.32.    Under a title policy issued to an owner, the failure of a policy to disclose title defects or liens directly and adversely affects the property owner because the owner is entitled to full market value of property. And that value is immediately reduced by any outstanding title defects or liens.  Title insurer issues title insurance on the basis of, and in reliance on, the quality of its own investigation into instruments which when recorded, impart constructive notice. Generally those records are public records concerning the status of the title.

4.33.    Some examples of standard exclusions include, easements not shown in public records; matters of survey; title defects attaching or created subsequent to the date of the policy; government police powers, laws, ordinances, regulations, building codes, and zoning laws that affect the occupancy, use, or enjoyment of land.  Notwithstanding that a title policy included one or more of these exceptions, the insured will have a supportable claim against the title insurer for loss sustained under the title policy where the error relates to omitted material that is within the scope of an ordinary title search.  *1119 Delaware v Continental Land Title Co.*, 16 Cal. App. 4th 992, 20 Cal. Rptr. 2d 438 (2d Dist. 1993).

4.34.    Defendant Preferred Mortgage filed the claim for an FHA loan funds and received the payment. They had a duty to obtain a title search, which among others, established that the house was made of concrete so that it qualified for the requested FHA loan. The title search used by defendant Preferred not only was faulty, as to the ownership of the land, but also, did not state what the house was made of even though this information was material to the claim for an FHA loan. Defendants FirstBank had financed this property and knew that the dwelling was made of wood and zinc with concrete slab foundation. Defendant FirstBank not only did not reveal this truth but also provided Plaintiff with an appraisal report which incorrectly stated that the dwelling was built in concrete. Defendant FirstBank knew about this wrongful information and did not take any steps to correct it.

4.35.    Defendant Preferred Mortgage acted in reckless disregard of the truth. Preferred Mortgage had a duty to look into the information being gather for the closing of this transaction. Instead, contacted defendant FirstBank through Adalberto Navarro to get a new appraisal. The appraisal report made on the year 2013, by Mario Carbia basically repeated the wrong information contained in Marlin Barreto's appraisal report. Even then, defendant FirstBank allowed the preparation of a second appraisal report without revealing the truth. The Edification Act contained the complete description of the dwelling. But, Capital Title nor any of the defendants bothered to inquiry for information missing from the notes at the property Registry. The missing information was material for the mortgage loan claim and would have prevented the transaction had FHA/HUD known about the correct description of the dwelling.

4.36.    That is so, that when defendant Preferred learned that Plaintiff Castro-Guerra had discovered that the dwelling was not as described in the appraisal reports, he refused to perform the scheduled repairs in the property. As a consequence, an Indemnification Agreement was subscribed in order to minimize actual or future losses by FHA/HUD.

4.37. In this case, documents registered at the Property Registry reflect that this property for which defendants Capital Title Services and Title Security Group provided a title abstract and insurance had several

defects which were not considered when preparing the title search and insurance selected. This included the faulty chain of title and the description of the property (wood and zinc house) which was material to the issuance of a title insurance, the settlement transaction and the claim for a federal loan. At the mere mention of "wood and zinc" and "the house does not belong to the owner of the land" further examination was required to ensure compliance with federal law.

4.38.   The Property Registry shows on the property of reference several journal entries (notes), not lengthy at all. The first one is an entry which has been voided by the Property Registrar. The second journal entry in the year 1997, is the piece of land that Plaintiff bought from defendant First Bank. The Case journal entry specifically stated that there was a structure built on the land that did not belong to Rafael Margarida Umpierre, individual who was selling the land to Luis Alfredo Hernandez-Garray.  Pursuant to the log entry at the Property Registry, Luis Alfredo Hernandez-Garray only bought the land since the owner of the structure did not appear in the transaction registered in the journal entry. The record clearly states that the seller of the land appearing in the transaction did not own the structure. The journal entry was not about the house, but about the sale of the lot.   The next (second) journal entry in the record of the Property Registry entered in the year 2006, shows the journal entry of the Edification Act prepared and registered upon defendant First Bank's request. It shows that Luis Alfredo Hernandez-Garray was paying rent ($6.85) to the owner of the structure while he was the owner of the lot. It shows that the structure was built on the lot of Don Julio Margarida, not on the lot owned by Luis Alfredo Hernandez-Garray. Notwithstanding, the record states that Luis Alfredo Hernandez-Garray had bought both the structure and the land in 1997.

4.39. This information reveals that after Hernandez-Garray bought the lot, without following the chain of title, the structure referred to at the registry as if built on another lot, was being registered to the name of Hernandez-Garray, as if built on his lot. This information warranted further investigation as well as notification to the parties to make them aware of it, since the record shows that it was Rafael Margarida Umpierre who sold

the land to Hernandez-Garray and who then paid rent for the house structure to Julio Margarida. There is a missing link in the title chain. Nowhere in the record states how Hernandez-Garray became has owner of the property, still, he appears selling it. Defendant Notary Public disregarded this information and executed the Purchase Deed. Moreover, Defendant Notary Public had it registered, and the Registry only shows ownership of the land by Plaintiff.

4.40. Right after, the third journal conveniently shows that this property (land and house structure) was sold to Emiliano Rosario-Cepeda, and this wood and zinc property was financed with a loan from defendant First Bank. A mortgage loan was illegally granted for this property in excess of the value of the property. One must wonder how a mortgage loan was approved without a statement which showed compliance with federal law that required that the property be in concrete for loan approval, especially FHA loans. This information was essential and material for the deal, and still, was not included in the Title Abstract nor was considered by the Notary Public who show have postpone the transaction or prevented it.

4.41. The next (fifth) journal entry reflects a mortgage foreclosure as result of Emiliano Rosario Cepeda's failure to make mortgage payments. As result of the foreclosure, defendant First Bank unexpectedly became the owner of the property. It is evident that the Edification Act was prepared and registered with the sole purpose of selling the property and getting a loan approved.  Without the Deed, it would not have been possible to sell the property because of a deficiency on the title chain. A proper, responsible and diligent title search and Notary Public due intervention would have exposed this information and would have prevented the approval of an FHA loan, the title insurance, and the false claim.

4.42. Also, the contract prepared for the settlement transaction reveals a property tax number of 79041-073-349-17-998, and the record shows no structure recorded in property tax records, CRIM.  Accordingly, the property is only valued at $5,000 with no structure at CRIM. This corroborates the above-stated. The Edification

Act registered upon defendant First Bank request is the only legal document which reveals that a structure does exists on this property in 2005, and it is the only document that contains a complete description of the property. This information was, and is, material to the transaction for which it was requested. All defendants, ignored its content.

4.43. All real estate documents prepared in 2005, for this property reveal the same original legal description of a 900 sq./ft. house, which are obtained from the original document, the Edification Act, without full disclosure that this was a wood house with a zinc roof. The information was available to all defendants because the seller had the documents registered and the documents were returned to their files. There has been a chain of misrepresentations and falsity from all defendants to conceal material information would have prevented the sale of the property, and the false claim for FHA loan, or any loan to that effect. In their own way, each one of the defendant has concealed information, have provided false, fraudulent information, and have acted with fraudulently in this transaction. The FHA loan approved on this property is illegal because the property does not qualify for such loan. Defendants' actions concluded in a unique fraudulent transaction that constitute a false claim regardless of their knowledge that the property was not made out of concrete, and that the house did not belong to owner of the land, and this fact was material to the claim.

4.44. Defendant, Capital Title Services filed copy of an abstract title search on this property prepared on April 1, 2013. This title search conveniently, but also grossly negligently, only covers the most recent repossession made by First Bank PR. In fact, it is identical in content to a title search prepared by JGI Title Service for First Bank on December 29, 2011. Comparing both title searches, it appears to be a cut and paste job. Both abstracts omit previous journal entries that were material to the settlement. It does not answer significant questions regarding the lack of structure at CRIM, the valuation of $5,000.00, or mention of the Edification Act. It does not state that there is a missing link in the chain of title on the house.

## C. TRUTH IN LENDING ACT, 15 U.S.C.A. §1601, ET. SEQ. AND REGULATION Z

4.45.    Plaintiff incorporates by reference ¶¶ 2.0 to 2.39, as if fully realleged herein.

4.46.    Truth In Lending Act, also known as TILA and Regulation Z, require disclosure of information that is not necessarily required in the disclosure statement if it were misleading as to constitute a violation of TILA. The Truth in Lending Act (TILA) et. seq., requires a "description of any security interest" and a "clear identification" of the subject property, 15 U.S.C.S. §1638 (a)(10) and (b) (5). Regulation Z defined the term "security interest" to include mechanic's, material men's, artisans and other similar liens, 12 C.F.R. §226.2(gg). Moreover, the possibility of a mechanic's lien is a "security interest" which must be disclosed under TILA and Regulation Z even though a mechanic's lien may never actually be taken, *Rudisell v. Fifth Third Bank*, 622 F.2d 243, 251 (6th Cir. 1980). Thus, the statutory purpose of "meaningful disclosure" must be considered in testing the adequacy of defendant's disclosure statement. See, e.g. *Collinwood Shale, Brick & Supply Co.*, 60 Ohio App., 2d 91, 395 N.E. 2d 907 (1978).

4.47. Regulation Z, 12 C.F.R. §226.8(b)(5), provides as follows: If after-acquired property will be subject to the security interest, or if other or future indebtedness is or may be secured by a such property, this fact shall be clearly set forth in conjunction with the description or identification of the type of security interest held, retained or acquired. Violations to TILA and Regulation Z occur when an extension of credit has failed to be disclosed in the disclosure statement which fails to clearly identify the property to which the security interest relates as required by 15 U.S.C. §1631(a) and §1639(a)(8) and 12 C.F.R. §226.6(a) and 226.8(b)(5); and fails to clearly disclose a retained security interest in after-acquired property, *Nesbitt v. Blazer Financial Services, Inc.*, 550 F. Supp. 819, 1982 U.S. Dist. LEXIS 16732.

4.48. The Truth in Lending Act (TILA) does not define "occurrence" of the violation, but TILA requires that disclosures be made before the credit is extended. Regulation Z, 12 C.F.R. §226.1 et seq. under the authority

granted in 15 U.S.C.S. §1604 by the Federal Reserve Board, and further guidance under 12 C.F.R. §226.8(a),

provides that disclosures shall be made before the transaction is consummated. "An unrecorded mechanic's

lien is not outside the definition of a security interest solely because it was not created by financing documents.

12 C.F.R.  §226.2(gg) includes in the definition of "security interest" any lien on a property arising by operation

of law. 15 U.S.C.S. §1635(a) grants a right of rescission in any consumer credit transaction where a security

interest, including any such interest arising by operation of law, is or will be retained or acquired in the real

property to be used as the residence of the debtor. TILA provides, 15 U.S.C. § 1640, for statutory penalties equal

to twice the finance charge if the creditor fails to disclose any information required under TILA. However, that

right is subject to a one year limitations period which starts running "from the date of the occurrence of the

violation." 15 U.S.C. § 1640(e).

4.49. All defendants are liable to Plaintiffs for their acts and or omission and/or their callous disregard

of the truth or falsity of the information provided to FHA, and also, all defendant either had actual knowledge

of the information or acted in deliberate ignorance of the truth or falsity of the information or acts in reckless

disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

4.50. All defendants participated in unique real estate sales transaction, which required making a false

record or statement to get a false or fraudulent claim approved and paid by the government, and/or conspired

to have a false or fraudulent claim paid by the government. Defendants participated in presenting or caused

to be presented to Federal Government a claim for approval and payment knowing that the claim was false or

fraudulent. 31 U.S.C.A. §3729 et seq. Defendants have provided false certifications, false disclosure, and false

description of the property on the appraisal reports, in the purchase option contract, and in the Deed. First

Bank provided false information in its title abstracts and appraisal report stating the property had clear title, that

property was free and clear of liens and encumbrances. These are violations of the Truth in Lending Act (TILA),

and Regulation Z, which in the case of First Bank PR Corp.'s failures of full fisclosure, are in violation of Consumer Credit Protection 15 USCA §1604 et. seq. and violation of FHA-HUD loan bank regulations for institutions insured by the FDIC.

4.51. First Bank PR Corp. was well aware that through the FHA certification process, which consists of creating a certified claim to obtain approval of funds from the Federal Government for a property that was worthless. Defendant First Bank PR Corp. owned the property since the year 2005, and provided false disclosure of information during the process. Defendant First Bank PR Corp. provided a commercial construction loan for this property in 2005 and/or made three (3) disbursements to previous owner Rosario-Cepeda.

*"Guaranteeing the following additional credits: Three credits equivalent to 10% of the principal are guaranteed for costs, expenses and attorneys' fees; for interests in addition to those guaranteed by law; and to cover any advance that may be made under this contract. This plot is appraised at an amount equivalent to the principal. CONDITIONS: <u>The mortgage is made extensive to any improvement, new construction or building that is introduced on the property</u>. The mortgage debtor waives his right to homestead."*

Defendants were well aware this property was a wood and zinc roof house plastered with cement. And still, they provided false representations to Plaintiff that the house was made of concrete, with concrete walls and concrete roof. They also provided representations to Plaintiff through an abstract title document that property was free and clear of liens and encumbrances. These are violations of the False Claims Act, 31 U.S.C.A. §3729 et seq.

4.52. First Bank PR Corp. processed a 30-year mortgage for this property in December 2005.  In 2013, another 30-year mortgage was processed for this wood and zinc roof house. It is illegal to generate a 30-year mortgage loan in Puerto Rico for a house made of wood and zinc roof, or to lend more money than the property is worth. <u>The property had severe title problems which defendant FirstBank tried to conceal by registering an Edification Act.</u> These are violations of the Truth in Lending Act, 15 U.S.C.A. §1601 et seq. and

Regulation Z 226 CFR et Seq. Defendant Preferred Mortgage processed the request for certification and approval of the FHA loan which was paid by FHA to defendant Preferred Bank PR Corp on the same date of the closing of the loan, knowing that the information provided was faulty, and/or in callous disregard of the truth by blindly relying on the information provided by other parties. Preferred Mortgage participated in this real estate transaction, they certified the property transaction, created a claim, and processed the payment that was paid by the Federal Government. Preferred Mortgage also processed and certified the FHA 203-K Home improvement loan. Preferred Mortgage still retains these FHA funds. The total of these 203-K funds is $7,836.00. This is the second claim processed by FHA. These funds were paid by FHA but have not been disbursed to Plaintiff. These are violation of the False Claims Act, 31 U.S.C.A. §3729 et seq.; and Truth in Lending Act, 15 U.S.C.A. §1601 et. seq.

4.53. Defendant Preferred Mortgage knew or should have known thru the stages of the process that there were defects in the property documentation, and in the records in the Property Registry and the CRIM, among others, in relation to the property. Defendant Preferred Mortgage generated its own title search and appraisal of the property, which were considered in the whole process and induced Plaintiff into the purchase of a wood and zinc house and into the financing by an FHA loan, which is prohibited by law. The valuation of the property is false, the property has serious title defects, the property is a wood and zinc roof house, after the sale, the property was registered by Preferred Mortgage and Notary with a different legal description as a "Plot of Land" in property records.

4.54.   These transactions recorded at Property Records do not reflect the legal documents signed by Plaintiff on April 30, 2013.  Both the transaction and the legal description reflect a different contract transaction and altered legal description on behalf of Notary Casellas and Preferred Mortgage one year later.

ENTRY BY CASELLAS   6th -   PURCHASE AND SALE – See (DOC 110.)

...'' before notary MR. JORGE E PÉREZ CASILLAS. Filed on the eighth hours and twenty three minutes of June of the year two thousand fourteen.

I RECORD the ownership of this plot in favor of Mr. ARTURO CELESTINO CASTRO GUERRA, by title of purchase."

ENTRY BY PREFERRED MORTGAGE   -   7th  MORTGAGE – See, exhibit 27.

..."OWNER: Recorded in favor of ARTURO CELESTINO CASTRO GUERRA, single, of legal age, owner and neighbor of San Juan, Puerto Rico, owner of this form according to 6th recording, hereinafter the debtor, who constitutes mortgage over this plot in guarantee of promissory note subscribed under affidavit number 19,624 in favor of PREFERRED MORTGAGE CORPORATION, or to its order, represented by Carlos Saltz Bakalar with faculties accredited at this office, for the principal sum of SIXTY TO THOUSAND EIGHT HUNDRED TWENTY SIX DOLLARS ($60,826.00)....
APPRAISAL. The plot is appraised at a sum equivalent to the original principal of the promissory note, which values shall serve as minimum in the event of auction."

Signed ... In San Juan on the twenty fifth day of June of the year two thousand fourteen. JUNE 25, 2014..)

These are all violations of the Truth in Lending Act, 15 U.S.C.A. §1601 et al.

4.55. Preferred Mortgage was informed of the serious deficiencies and the fact it was a wood and zinc roof house within 10 days after transaction was completed on April 30, 2013. Preferred Mortgage could have reversed the entire transaction at the moment. The Truth in Lending Act, allows for a rescission (reversal) of a transaction when serious deficiencies are discovered by the buyer which comprehend false disclosure, undisclosed liens, severe title problems, false valuation, false property description. Plaintiff received no assistance from Preferred Mortgage for this problem.

4.56. The title abstracts performed by Capital Title Services is faulty, defective and ineffective, of poor quality, and failed to detect major deficiencies in this property, and therefore, allow the business transaction to go through. The title abstract is a copy of a prior title abstract performed by CGI Title for First Bank in December 2011. Furthermore, plaintiff Castro-Guerra relied on this title abstract, and paid for their services when he made the decision to buy the property. The title abstract failed to examine a document Edification Act prepared by Francisco Diaz-Herrero on November 29, 2005, which revealed serious title defects on this property and the

fact the structure was made of wood and zinc roof. Capital Title Services Inc. provided the title search; Title Security Group Inc. provided the Title Insurance. Their services are part of the certification of said property. The description of the property is also false. These are violation of the Truth in Lending, 15 U.S.C.A. §1601, and the False Claims Act, 31 U.S.C.A. §3729.

4.57. The title abstract failed to disclose that this property was a wood and zinc house of 900 sq./ft., and also failed to disclose that structure belonged to a third person. The title abstract failed to disclose serious deficiencies of title. These deficiencies seriously affect the value of this property. Capital Title Services and Title Security Group, Inc. failed to examine documents such as Edification Act prepared by Notary Francisco Diaz Herrero on November 29, 2005, which reveal the essential information of this property. Plaintiff paid for the Title Abstract and the Title Insurance Policy of both defendants. Plaintiff relied upon the services provided by defendants to determine if property has clear title and is free of liens and title defects. Failure to disclose prior liens, serious defects in title are violations of non-disclosure in the Truth in Lending Act 15 U.S.C.A. §1601 et al., and Regulation Z. The Government also paid a false claim as a result of these false representations and certifications, False Claims Act 31 U.S.C.A. §3729 et al.

4.58.    Defendant Notary Public Jorge Perez-Casellas, prepared the purchase contract for the real estate settlement of this property. These services are part of the settlement services covered by the Real Estate Settlement Procedures Act (RESPA) under 12 USCA §2602. Notary public Jorge Perez is an indispensable party of this complaint. All parties involved in this RESPA are indispensable parties and are part of this complaint. Also, the legal research conducted by Notary Public Jorge Perez failed to detect major deficiencies in this property as previously described, which would have prevented Plaintiff from buying the property and financing it with an FHA mortgage loan. Defendant Perez is part of the certification process, which resulted in a claim and a payment by the U.S. Government. These are violations of Truth in Lending Act 15 U.S.C.A. § 1601 et al., and Regulation Z §226 CFR et seq.; and False Claims Act 31 U.S.C.A. §3729 et al.

4.59. Defendant Notary Perez was hired by First Bank PR Corp. and Latimer Law firm to prepare the purchase contract deed. Notary Public Perez  had available all documents, including prior legal documents pertaining to this property including the "Act of Edification" from First Bank PR Corp. and the Latimer Law firm. Defendant notary public Perez informed Plaintiff in a motion filed by him that he was not under any duty and did not have the responsibility to inform Plaintiff of title defects of this property or that it was of "wood and zinc roof". This is a disclosure violation of the Truth in Lending Act, Act 15 U.S.C.A. §1601 et. al., and Regulation Z. A false claim was filed to the Government as a result of these actions. The Government paid a false claim as a result of these representations and certifications. See (Allegations #24).

4.60. Plaintiff conducted a search of property records in 2014. This limited search revealed that in July 2013, Preferred Mortgage and notary public Perez filed documents with the registrar of property records, which disclose this property is a "plot of land". There is no acknowledgment that this property contains a house. The legal description at property records was changed. The legal description at property records does not match the legal description of property in the purchase deed signed on April 30, 2013. This is another violation of the Truth in Lending Act, 15 U.S.C.A. §1601 et seq.  The acts and conduct of defendants constitute violations of the False Claims Act 31 USCA §3729, §3730 et seq. which involve the payment by the U.S. Government under the Federal Housing Administration for what constitute a "claim" within the meaning of the False Claims Act 31 USCA § 3729; Truth in Lending Act 15 U.S.C.A. §1601 et al., and Regulation Z §226 CFR et. seq.; and RESPA.

### D.      FEDERAL HOME LOAN MORTGAGE CORPORATION ALSO KNOWN AS "FHLMC":

4.61.     Plaintiff incorporates by reference ¶¶ 2.0 to 2.39, as if fully realleged herein.

4.62.     Section 1454, 12 U.S.C.A §1454, regulated the "Federal Home Loan Mortgage Purchase and Sale of Mortgages and residential mortgages. In its pertinent part it states:

(a) (2) – No conventional mortgage secured by a property comprising one to four family dwelling units shall be purchased under this section if the outstanding principal balance of the mortgage at the time of purchase exceeds 80(%) per centum of the value of the property securing the mortgage...

4.63. The legislation also regulates the insurance of financial institutions and the loans for construction and improvements. Section 1703 refers to Insurance of financial institutions where the Secretary is authorized and empowered, upon such terms and conditions as he may prescribe, to insure banks, trust companies, personal finance companies, mortgage companies, building and loan associations, installment lending companies, and other such financial institutions, which the Secretary finds to be qualified by experience or facilities and approves as eligible for credit insurance, against losses which they may sustain as a result of loans and advances of credit, and purchases of obligations representing loans and advances of credit, made by them for the purpose of (i) financing alterations, repairs, and improvements upon or in connection with existing structures or manufactured homes, and the building of new structures, upon urban, suburban, or rural real property (including the restoration, rehabilitation, rebuilding, and replacement of such improvements which have been damaged or destroyed by earthquake, conflagration, tornado, hurricane, cyclone, flood, or other catastrophe), by the owners thereof or by lessees of such real property under a lease expiring not less than six months after the maturity of the loan or advance of credit; and for the purpose of (ii) financing the purchase of a manufactured home to be used by the owner as his principal residence or financing the purchase of a lot on which to place such home and paying expenses reasonably necessary for the appropriate preparation of such lot, including the installation of utility connections, sanitary facilities, and paving, and the construction of a suitable pad, or financing only the acquisition of such a lot either with or without such preparation by an owner of a manufactured home; and for the purpose of financing the preservation of historic structures, and, as used in this section, the term "historic structures" means residential structures which are registered in the National Register of Historic Places or which are certified by the Secretary of the Interior to conform to National Register

criteria; and the term "preservation" means restoration or rehabilitation undertaken for such purposes as are approved by the Secretary in regulations issued by him, after consulting with the Secretary of the Interior.

4.64. Other than in connection with a manufactured home or a lot on which to place such a home (or both), in no case shall the insurance granted by the Secretary under this section to any such financial institution on loans, advances of credit, and purchases made by such financial institution for such purposes exceed 10 per centum of the total amount of such loans, advances of credit, and purchases. With respect to any loan, advance of credit, or purchase, the amount of any claim for loss on any such individual loan, advance of credit, or purchase paid by the Secretary under the provisions of this section to a lending institution shall not exceed 90 per centum of such loss. After the effective date of the Housing Act of 1954, (i) the Secretary shall not enter into contracts for insurance pursuant to this section except with lending institutions which are subject to the inspection and supervision of a governmental agency required by law to make periodic examinations of their books and accounts, and which the Secretary finds to be qualified by experience or facilities to make and service such loans, advances or purchases, and with such other lending institutions which the Secretary approves as eligible for insurance pursuant to this section on the basis of their credit and their experience or facilities to make and service such loans, advances or purchases; (ii) only such items as substantially protect or improve the basic livability or utility of properties shall be eligible for financing under this section, and therefore the Secretary shall from time to time declare ineligible for financing under this section any item, product, alteration, repair, improvement, or class thereof which he determines would not substantially protect or improve the basic livability or utility of such properties, and he may also declare ineligible for financing under this section any item which he determines is especially subject to selling abuses; and (iii) the Secretary is hereby authorized and directed, by such regulations or procedures as he shall deem advisable, to prevent the use of any financial assistance under this section (1) with respect to new residential structures (other than manufactured homes)

that have not been completed and occupied for at least six months, or (2) which would, through multiple loans, result in an outstanding aggregate loan balance with respect to the same structure exceeding the dollar amount limitation prescribed in this subsection for the type of loan involved: Provided, That this clause (iii) may in the discretion of the Secretary be waived with respect to the period of occupancy or completion of any such new residential structures.

4.65. The Secretary is hereby authorized and directed, with respect to manufactured homes to be financed under this section, to (i) prescribe minimum property standards to assure the livability and durability of the manufactured home and the suitability of the site on which the manufactured home is to be located; and (ii) obtain assurances from the borrower that the manufactured home will be placed on a site which complies with the standards prescribed by the Secretary and with local zoning and other applicable local requirements.

4.66. The insurance authority provided under this section may be made available with respect to any existing manufactured home that has not been insured under this section if such home was constructed in accordance with the standards issued under the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 USCS §§ 5401 et seq., and it meets standards similar to the minimum property standards applicable to existing homes insured under title II, 12 USCS §§ 1707 et seq. Alterations, repairs, and improvements upon or in connection with existing structures may include the provisions of fire safety equipment, energy conserving improvements, or the installation of solar energy systems. Alterations, repairs, and improvements upon or in connection with existing structures may also include the evaluation and reduction of lead-based paint hazards.

4.67. In the above-captioned case defendants incurred in a violation of the statute because this house was valued at time of purchase at $105,000, when in fact the house is worthless, and in need of demolition. This, among others, constitute a clear violation of the FHLM regulations, and all defendants played its role in this transaction. Plaintiff was approved a construction loan which he is repaying along with mortgage payments

and interests. The approval of said loan is also illegal. The purchase Deed in this case did not comply with all requirements since the description of the property is material for compliance with the cited law. The FHA 203(k) construction loan cannot be used at all for this property. These are violations of an FHA Home Loan Mortgage. Preferred Mortgage violated these FHA provisions by generating an FHA loan under these market valuations guidelines. The FHA loan is illegal for a thirty (30) years term on a wood and zinc roof house.

### E.    THE "AS IS " CLAUSE:

4.68. Plaintiff incorporates by reference ¶¶ 2.0 to 2.39, as if fully realleged herein.

4.69.    The "as is" warranty is not an absolute protection or defense in the sales process. It does not protect defendant First Bank PR Corp. or their legal representatives and other parties when they have knowingly withheld information which is detrimental to the prospective sale of a property they own. Lack of full disclosure of information by defendant First Bank PR Corp. or their legal representatives and all other defendants represents a conduct of falsity throughout the entire sales process.

4.70. Defendants allege that the almighty "as is" clause protects defendants from fraudulent transactions. Defendants claim appears to be that the almighty "as is" clause allows no defenses whatsoever available to Plaintiff or the United States Government, whenever there might be one available. Moreover, it implies that by including the "as is" clause defendants are absolutely immune as to any liability, even under the particular circumstances in this case. Notary Public has a duty to consider and comply with all applicable federal, state and local laws, ordinances, codes, rules and regulations when drafting the deed in consideration to law applicable to the transaction.

4.71. "*As Is*", means in the existing condition without modification; the customer bought the car as is, under UCC §2-136(3)(a), a seller can disclaim all implied warranties by stating that the goods are being sold "as is" or "with all faults".  Generally, a sale of property "as is" means that the property is sold in its existing condition, and use of the phrase "as is" relieves the seller from liability for defects in that condition. *Blacks Law Dictionary,*

Bryan A Garner, Editor, Thomson West, 8th Edition, 2004. But, the *Wiegmann* court stated that the "as is" provision in was standard, boiler-plate language used in every contract and deed for the transfer of property, and only protected the defendant from claims for breach of warranty and not from statutory causes of action. *Wiegmann & Rose International Corp. v. NL Industries*, 735 F.Supp. 957, at 961. (N.D.Cal.1990).

4.72. The making of a sale "as is" is a waiver of any implied warranties. Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* §§ 2-316:151 et seq. (3d ed.). An "as is" clause is not effective to waive warranties when the circumstances are such that it would not give the buyer reason to know that the buyer was surrendering a warranty. Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* §§ 2-316:151 et seq. (3d ed.)  An "as is" clause has no effect on the seller's tort liability. As a result, it does not disclaim liability for negligence, fraud or strict tort liability. 3A Anderson U.C.C. § 2-316:151 (3d. ed.). An "as is" clause cannot be relied on to bar a claim for fraudulent misrepresentation or fraudulent concealment. Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* §§ 2-316:151 et seq. (3d ed.).116.

4.73. However, defendants overlook that we are dealing with a claim of tort, not breach of contract. Such an exculpation clause may be relevant to the contract, but it has no bearing on a claim of tortuous misrepresentation, whether intentional or negligent. Such a provision is akin to an "as is" clause often found in real estate contracts. The general rule is that such a provision does not preclude buyers' actions based on fraud, misrepresentation, or nondisclosure. See, for example, *Silva v. Stevens*, 156 Vt. 94, 112, 579 A.2d 852, 863 (Vt. 1991), where the court dealt with a contract provision which provided that the "property and furnishings and appliances are sold "*as is*" and no representation has been made by the broker regarding the age or condition of the same." The court have held that:

4.74. "The term "*as is*" language which in "common understanding" means that there are no implied warranties in connection with the property sold. …. It does not denote an exclusion of tort liability… Indeed, it

does not address tort liability at all. Consistent with that view, the law is clear that the presence of an "as is" clause in a sales contract does not as a matter of law defeat a fraud claim." *Robinson v. Wright*, 2006 WL 6265627 (D.Me.).

4.75. With regards to Warranty of Titles, "a warranty that seller or assignor of property has title to that property, that transfer is rightful, and that there are no liens or encumbrances beyond those that buyer or assignee is aware of at the time of contracting. This warranty arises automatically whenever anyone sells goods." "Generally there is an implied covenant of good faith and fair dealing in every contract. Whereby neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of contract." *Lloyd Nolan Foundation v City of Fairfield*, 837 So. 2d 253 (Ala. 2002). "The implied duty of good faith and fair dealing is inherent in a contract even if a contract implicates a statute that does not confer a private right of action." *RJ Gaydos Agency v National Consumer Ins*., 773 A.2d 1132 (2001).

4.76. "The implied covenant of good faith requires the parties to perform, in good faith, the obligations required by their agreement, and violation of the covenant occurs when either party violates, nullifies or significantly impairs any benefit of the contract." *Steiner v Ziegler Tamura Ltd*., 61 P 3d 595 (2002); American Jurisprudence 2d, Vil 17A, Contracts, Section 370, Thomson West, 2004. The meaning of the phrase "as is", as it appears in contracts dealing with the sale of personalty has no similarly accepted meaning in contract dealing with realty, *Partrich v. Muscat*, 84 Mich. App. 724 (1978). In *Schoeneweis v. Herrin*, 110 Ill. App.3d 800 (1982), the Court stated that Section of Uniform Commercial Code providing that unless circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", is not applicable to contracts for the sale of real estate.

4.77. In *Helldrick*, the issue of the fraudulent concealment was addressed. The court stated that, seller with knowledge of redhibitory defect who, rather than informing buyer of defect, opts to obtain waiver of

warranty implied by law, commits fraud, which vitiates waiver because it is not made in good faith. *Helwick v. Montgomery Ventures Ltd.*, 665 So.2d 1303 (1995). The factual question as to vendor's knowledge of additional underground tanks not disclosed in sale agreement and as to whether vendor's actions constituted fraud overcoming renunciation of warranty precluded summary judgment on purchasers' claim for rescission or reduction of purchase price. Seller with knowledge of "redhibitory" defect who, rather than informing buyer of defect, opts to obtain waiver of warranty implied by law, commits fraud, which vitiates waiver because it is not made in good faith. *Helwick v. Montgomery Ventures Ltd.*, 665 So.2d 1303 (1995).

4.78.    When purchaser brought action for fraud against vendor, an omission or concealment of material facts can constitute misrepresentation, just as can positive, direct assertion. Evidence that vendor made repairs to residence which concealed foundation defect and did not disclose this material fact to purchaser in negotiations that led to sales contract supported trial court's finding of fraud. *Davidson v. Rogers*, 431 So.2d 483 (1983). In that case, the appellee had acquired the property in 1966 as the first owner. He gave evidence there were no foundation problems when he sold the property and denied any patchwork repairs had been done to the home. The chancellor concluded that at the time of purchase the "slab" had cracked and appellee either knew or should have known of this defect. He further found that repairs had been made to the residence by appellee, which concealed the condition at the time of sale. *Davidson v. Rogers*, *Id.* In this case, the trial court found that appellee made repairs to the residence which concealed the foundation defect and did not disclose this material fact to appellant in the negotiations that led to the sales contract and assumption of the deed of trust. We are of the opinion the evidence convincingly supported the chancellor's ruling in this respect. *Id.*

4.79. In sum, even though the "*as is*" clause has been used broadly and indiscriminately forever, the fact is that clause constitute a waiver for a warranty known by the party making the waiver. There must be knowledge of what is being waived. Legal requirements cannot be waived since private parties are not

legislators. The clause cannot be used to conceal fraud. Therefore, as in this case, a party who conceals information material to the transaction that involves the "as is" clause to evade lack of compliance with the laws and to illegally obtain the buyer's consent cannot be protected by the clause.

4.80. Defendants cannot claim the implied warranty "as is" when the parties involved have failed to provide "full disclosure of information". "*As is*" applies to documentary statements produced by the defendants where it said that the property was made of concrete. All defendants have concealed information in their possession and/or available to them, have provided false information, and have acted with falsity and in reckless disregard of the truth or falsity of the records in this transaction.

## F. SUPPLEMENTAL JURISDICTION PURSUANT TO SECTION 1802

4.81.    Plaintiff incorporates by reference ¶¶ 2.0 to 2.39, as if fully realleged herein.

4.82.    Section 1802 of the Civil Code provides: "A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141, et. seq.  The basic elements of a Section 1802 action for defamation do not differ from those of a general negligence action under Section 1802 of the Civil Code. Plaintiff must show that defendant's wrongful or negligent actions actually and proximately caused plaintiff certain and quantifiable damages. *Id*.

4.83. In Puerto Rico, regulations concerning approval of residential loans, prohibit a loan greater than fifteen (15)-years or 75% of the useful life, whichever the lesser to construct a house of wood with a roof of zinc. These include Federal, FHA loans. The "Banco Gubernamental de Fomento" (BGF), has a regulation concerning the grant of loans, (Reglamento Sobre Concesión de Préstamos), 2001, Art. 7 (h), (i), p.8; Law No. 103 of August 11, 2001. It is in violation of local and federal regulations to provide a thirty (30) year mortgage for a wood and zinc house. Defendants engaged in fraudulent acts to induce Plaintiff to purchase a property causing damages. Title of property is not clear. Plaintiff has not been able to live in the worthless property sold by defendant

FirstBank to Plaintiff and has caused continuous economical lost, deprivation of a dwelling, and extreme ongoing emotional distress, among others. All defendants are jointly liable to Plaintiff for all damages suffered.

4.84. The Puerto Rico Mortgage states, "the notary or official who, by mistake, causes an omission which impedes the registration of a transaction or contract in accordance with the provisions of this subtitle shall immediately make the correction upon demand, issuing a new document at his own expense, if possible, and compensating the interested parties for the damages caused by his mistake, in every case". ... See, 30 L.P.R.A 226.

4.85. Defendant FirstBank sold a real estate property to Plaintiff Arturo Castro-Guerra under false pretense. In the year 2005, defendant FirstBank provided financing for a wood and zinc dwelling which only had a concrete slab foundation. When the property was repossessed defendant FirstBank knew that this house had been built in wood and zinc.

4.86. Defendant provided false information and misrepresentations in order to sell this property and obtain the FHA/HUD check (in effect a federal claim) for this property. The claim constitute a False Claim under the Act and, and in effect, the Federal Government is the owner of this loan FHA Loan # 13-5444 that was obtained through these false misrepresentations and lack of full disclosure.  The creditor of this loan is GNMA, the Federal Government. These failures of Full Disclosure are in violation of the Truth in Lending Act, 15 U.S.C.A. § 1601, et al., the False Claims Act; 31 U.S.C.A. §3729, et al., and Federal Home Loan Mortgage regulations; 12 U.S.C.A.  § 1454, et al. The information disclosed to Plaintiff was inapplicable to the loan legally applicable to the property bought.

4.87. All defendant acted together in the process of submitting and approving by either providing services as part of the process or submitting the claim request for a federal loan itself and therefore are severally and jointly liable to Plaintiff for all damages suffered by him which were foreseeable. They knew or should have

known that the faulty information was going submitted to the federal government for the approval of the loan and putting at risk federal funds and Plaintiff's interests in the subject property.

WHEREFORE, it is respectfully requested that this Honorable Court takes notice of the above, denies defendants' Motion for Summary Judgment at dockets 79, 89, 90, and 9; and find Defendants liable for the damages caused to Plaintiff and rescind the transactions of April 30th 2013. In the alternative, it is respectfully requested that Plaintiff be given an opportunity to complete discovery and allowed his day in court.

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, on this 21, day of January, 2016.

I HEREBY CERTIFY that on this very same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*S/Lavy Aparicio-López*
LAVY  APARICIO-LÓPEZ
Attorney at Law
USDC-PR Bar No. 219503
Cond. Los Cedros 1687
Amarillo St. # 6202
San Juan, P.R. 00926
E-Mail: lavyaparicio@gmail.com
Tel.: (787) 640-6600