IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

Arturo Castro-Guerra,

     Plaintiff,

          v.                              **Civil No. 14-1280 (SEC)**

Firstbank Puerto Rico, et al.,

     Defendants.

## OPINION & ORDER

In February 2013, Arturo Castro-Guerra (Plaintiff) signed an option to purchase a repossessed property located in Santurce, Puerto Rico from co-defendant Firstbank Puerto Rico (Firstbank). Plaintiff financed the purchase through a federally-insured loan with co-defendant Preferred Mortgage Corporation (Preferred). As part of the closing process, co-defendant Capital Title Services, Inc. (Capital) performed a title study on the property, and Title Security Group, Inc. (Title) provided title insurance. The deal was finally closed two months later with the assistance of notary, and also co-defendant, Jorge Pérez-Casellas. After the sale, Plaintiff became aware that his house was not made of concrete, as advertised, but was in fact "constructed of wood walls and a zinc roof plastered in cement." Docket # 87, p. 7. The structure, moreover, was "heavily infested with termites." Id. According to Plaintiff, the structure has partially collapsed and must be demolished. See id.; see also Docket # 125.

In response, Plaintiff filed suit against all the aforementioned co-defendants (collectively, Defendants), alleging a panoply of violations to the following federal statutes: the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq.; False Claims Act, 31 U.S.C. §3729, et seq.; Real Estate Settlement Procedures Act ("RESPA") 12

U.S.C. § 2601 *et seq.*; and the Federal Home Loan Mortgage Corporation Act ("FHLMCA"), 12 U.S.C. § 1454, *et seq.* Plaintiff also brought a supplemental state-law claim under Puerto Rico's general tort statute, Article 1802 of the Civil Code, P.R. Laws Ann. Tit. 31 § 5141.[1]

Pending before the Court are several motions for summary judgment filed by Defendants, and Plaintiff's briefs in response. The common theme across these motions is that Plaintiff has failed to state a claim under any of the federal statutes, and therefore the Court lacks jurisdiction to hear the rest of the case. For the reasons that follow, the Court agrees.

## I.      Standard of Review

Summary judgment is appropriate only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a "reasonable fact-finder could resolve in favor of either party and a material fact is one that could affect the outcome of the case." Flood v. Bank of Am. Corp., 780 F.3d 1, 7 (1st Cir. 2015). When conducting this analysis, courts "may not weigh the evidence," Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994), and must construe the record in the "light most flattering" to the nonmovant. Soto-Padró v. Public Bldgs. Authority, 675 F.3d 1 (1st Cir. 2012).

## II.     Analysis

### a.  Truth in Lending Act (TILA)

Congress enacted TILA in order "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601 (emphasis added). In furtherance of these goals, TILA requires a creditor to disclose "information relating to such things as finance charges, annual percentage rates of

---

[1] Plaintiff's claim against the notary is limited to the tort claim under this statute.

interest, and borrowers' rights, and it prescribes civil liability for any creditor who fails to do so." Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 54 (2004) (internal citations omitted).

The problem with this claim is immediately evident. In broad strokes, Plaintiff's claims are based on the alleged misrepresentations made regarding the physical characteristics of the property he purchased, instead of the credit terms to which he agreed. So by Plaintiff's own construction, his case falls outside the scope of relief afforded by TILA.

Nevertheless, Plaintiff appears to take a different tack in his opposition. He fastens his argument on a portion of § 1639c(f), which provides that:

> No creditor may extend credit to a borrower in connection with a consumer credit transaction […] that provides or permits a payment plan that may, at any time over the term of the extension of credit, result in negative amortization…

15 U.S.C. § 1639c(f). Plaintiff contends that, since the property was appraised under the assumption that the structure was made of concrete, the property was heavily overvalued at the time of closing. According to Plaintiff, this means that the property is "in negative equity and amortization…," and thus that Defendants violated § 1639c(f). See Docket # 87, p. 7.

The flaw here is that Plaintiff equates an "underwater" mortgage with the term "negative amortization." The former is used to describe a "mortgage loan for which more is owed than the property securing the loan is worth." Merriam-Webster Online Dictionary, "Underwater", http://www.merriam-webster.com/dictionary/underwater. The latter is used to describe credit terms that allow an "increase in a loan's principal balance caused by monthly payments insufficient to pay accruing interest." See Black's Law Dictionary, "Amortization" (10th ed. 2014). This distinction proves fatal here since, even if the property is underwater, Plaintiff has not demonstrated that the

terms of the loan used to purchase the property allows for the negative amortization of the loan. As a result, this claim must be dismissed.

Plaintiff also claims that Firstbank, Preferred, Capital, and Title violated the "appraisal independence" requirement of TILA, which is contained in § 1639e. This subsection makes it unlawful, "in extending credit or in providing any services for a consumer credit transaction secured by the principal dwelling of the consumer, to engage in any act or practice that violates appraisal independence," as specified in that section. See § 1639c(f) (emphasis added).

While there are no reported cases interpreting this provision, the text of the statute provides ample support for a decision. To start with, Firstbank cannot be held liable under TILA because it did not "extend" Plaintiff any credit, nor did it provide "services" for the credit transaction used by Plaintiff to purchase the property. Instead, it acted as the seller in the transaction. But even if Firstbank could somehow be considered to have provided these services (for instance, in securing an appraisal more than a year before Plaintiff signed the option to purchase the property), liability under TILA cannot attach.

The acts or practices prohibited under the appraisal independence subsection all involve some element of trickery. For instance, it is illegal for a person with an interest in the transaction to coerce or collude (among a myriad other verbs involving malice or fraud) with the appraiser in order to cause the appraised value to be "based on any factor other than the independent judgment of the appraiser." § 1639e(b)(1); see also § 1639e(b)(1) (unlawful to influence appraiser to encourage a target appraisal value); and § 1639e(b)(4) (withholding payment for appraisal report). It is also unlawful to mischaracterize, or suborn the mischaracterization of, the appraised value of the property. § 1639e(b)(2). While Plaintiff does not specify which of these "acts or practices" were violated, he specifically mentions "misrepresentation," and so the latter subsection is likely his ticket. But even so, his claim necessarily fails.

First, Plaintiff concedes that the appraisal was conducted by an independent appraiser rather than by Firstbank. Indeed, he admits that "FirstBank retained the professional appraisal services of Marlin Barreto to perform an appraisal on the property." See Docket # 114, ¶ 141. On the record, Firstbank had nothing to do with calculating the appraisal value. Also, there is also no evidence showing that Firstbank "mischaracterized" the appraisal value. On the other hand, the record is barren of any facts from which the Court could infer that Firstbank somehow "suborned" the property appraiser in order to obtain a favorable value on the property.[2] Plaintiff's TILA claim against Firstbank therefore fails.

On the other hand, the record shows that the other Defendants had nothing to do with the property appraisal. Plaintiff admits, for instance, that Preferred was actually clueless as to the condition of the property. See Docket 92-1, ¶ 29 (stating that if "Preferred had known that this is a wood house, they would not have approved the mortgage of that or the 203-K Loan either"). On the other hand, Capital and Title's involvement in this transaction was limited to the title study and insurance, and had nothing to do with the appraisal. The TILA claims as to these Defendants therefore fail as well.

### b. Real Estate Settlement Procedures Act (RESPA)

Congress enacted RESPA with the purpose of providing consumers with "greater and more timely information on the nature and costs of the settlement process" and to ensure that they are "protected from unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C § 2601. As a threshold matter, the number of private causes of action under RESPA are expressly limited. See e.g. Lawrence v. Emigrant Mortgage Co., 2012 WL 1108532 at *9 (D.N.J. Mar. 30, 2012) (collecting cases); 12 U.S.C. § 2614 ("Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought in the United States district court…").

---

[2] Further, there are also no grounds to believe that the appraiser acted in bad faith in finding that the property was presumably made of concrete. Indeed, as Plaintiff admitted, even the FHA inspector retained by Preferred to inspect the property prior to the sale concluded that the same was structurally sound. See Docket 90-1, ¶ 18.

Liberally construed, Plaintiff's cause of action against Firstbank can only be premised on § 2608, which prohibits a "seller of property that will be purchased with the assistance of a federally related mortgage loan [from requiring] directly or indirectly, as a condition to selling the property, that title insurance covering the property be purchased by the buyer from any particular title company." 12 U.S.C. § 2608(a). But Plaintiff admitted in his deposition that Firstbank never required him to purchase title insurance, but rather only acted as a seller in the transaction. See Docket # 89, p. 11. This claim against Firstbank, then, cannot stand.

Against the other co-defendants, Plaintiff's RESPA claims must come through a different route. As mentioned above, it is evident that Congress only authorized RESPA claims under §§ 2605, 2607, or 2608 of the statute. See 12 U.S.C. § 2614. Section 2608 imposes requirements only on sellers, while § 2605 deals with escrow accounts and various disclosure requirements not relevant to this case. As such, Plaintiff's claims against the remaining Defendants can only be channeled through § 2607.

Subsection 2607(a) prohibits anyone from giving or accepting a fee, kickback or any "thing of value" in exchange for referrals of settlement service business involving a "federally related mortgage loan." 12 U.S.C. § 2607(a). Nothing of the sort has been alleged in this case. But subsection 2607(b) provides that: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b). As far as the Court has been able to discern, Plaintiff's argument hinges on the underlined text. He argues that, since the title study prepared by co-defendant Capital was materially indistinguishable from the abstracts that had been previously prepared concerning that property (he says it was a "copy-

and-paste job"), Capital received an "unearned fee" for that service.[3] Nevertheless, Plaintiff's argument is entirely foreclosed by Supreme Court precedent.

In <u>Freeman v. Quicken Loans, Inc.</u>, the Supreme Court held that – given the "fee splitting" language – "a plaintiff must demonstrate that a charge for settlement services <u>was divided between two or more persons</u>" in order to establish a violation of § 2607(b). 132 S. Ct. 2034, 2044 (2012) (emphasis added). With respect to the fees charged for the title study –which are the only fees identified in this "unearned fee" argument– Plaintiff has not even alleged that those fees were "split" with anyone else. As a result, Plaintiff's remaining RESPA claim fails as well.

### c.  False Claims Act (FCA)

The FCA "imposes civil penalties and treble damages on persons who submit false or fraudulent claims for payment to the United States." <u>Schindler Elevator Corp. v. U.S. ex rel. Kirk</u>, 563 U.S. 401, 405 (2011). A "claim" under the FCA "includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." <u>Universal Health Servs., Inc. v. United States</u>, 136 S.Ct. 1989, 1996 (2016) (quoting § 3729(b)(2)(A)). In an effort to expand the scope of enforcement and maximize recovery of these funds, Congress authorized both the Attorney General and private persons to bring civil suits under the FCA. 31 U.S.C. § 3730(a). These private suits, termed *qui tam* actions, are brought by "relators" on behalf of the federal government. 31 U.S.C. § 3730(b). As an incentive to bring suit, the FCA allows these deputized relators to partake in the proceeds of these actions along with the Government.

Plaintiff's argument under the FCA depends, in essence, on the fact that the loan used to purchase the property was backed by the Federal Housing Administration. Thus, Defendants' alleged misrepresentations led to the approval of a loan used to purchase an overvalued property. This, he claims, constitutes actionable fraud against

---

[3] It bears mentioning that Plaintiff's argument is based on the title of the statute rather than its text. Indeed, the words "unearned fees" are not actually found in the body of the statute. Nevertheless, given the discussion below, the Court need not interpret what "unearned fees" mean in the context of this case.

the United States. But whatever the merits of his FCA claim, the same falters before the starting block.

Under the FCA, the relator must comply with two threshold requirements before any *qui tam* action may proceed. First, the relator must serve a "copy of the complaint and written disclosure of substantially all material evidence and information" it has on the government. Id., § 3730(b). In order to avoid premature disclosure, the complaint must be filed in camera with the court, where it "shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." Id. The United States may then choose to "proceed with the action, in which case the action shall be conducted by the Government," or it may "notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." § 3730(b)(4)(A)-(B). At all times, the government retains the right to dismiss the action or settle the case. § 3730(c)(2)(A)-(B).

As the Second Circuit recognized in U.S. ex rel. Pilon v. Martin Marietta Corp., these procedural requirements serve important policy interests. 60 F.3d 995, 998 (2d Cir. 1995). For instance, the sixty-day sealing period and the service requirement allows "the Government an adequate opportunity to fully evaluate the private enforcement suit and determine both if that suit involves matters the Government is already investigating and whether it is in  the Government's interest to intervene and take over the civil action." Id. (citing S.Rep. No. 345, 99th Cong., 2d Sess. 23–24, reprinted in 1986 U.S.C.C.A.N. 5266, 5288–89). It also relieves defendants from having to "answer complaints without knowing whether the government or relators would pursue the litigation." Id. The Second Circuit also identified other interests, including the protection of a defendant's reputation from meritless *qui tam* suits – "because the public will know that the government had an opportunity to review the claims but elected not to pursue them" – and the potential for a defendant to settle with the government before the complaint becomes unsealed. Id.

Courts are somewhat divided concerning what to do when a plaintiff does not comply with the sealing requirement. Compare U.S. ex rel. Bibby v. Wells Fargo Home Mortgage Inc., 76 F. Supp. 3d 1399, 1407 (N.D. Ga. 2015) (recognizing that a "majority of courts to address the appropriate remedy for a seal violation in a *qui tam* case consider the objectives of the sealing requirement—and particularly the Government's interest in investigating the allegations—and assess whether the particular seal violation hampered these objectives."); with United States ex rel. Summers v. LHC Grp., Inc., 623 F.3d 287, 296 (6th Cir. 2010), cert. denied, 564 U.S. 1037 (2011) (holding that "violations of the procedural requirements imposed on qui tam plaintiffs under the False Claims Act preclude such plaintiffs from asserting qui tam status"). To the Court's knowledge, the First Circuit has not expressed its position on the matter.

Regardless, this case is distinguishable from those which only involve violations to the sealing requirements. Here, Plaintiff also failed to serve the Government with his complaint, and also failed to provide "written disclosure of substantially all material evidence and information" to the Government. See § 3730(b). In Pilon, the Second Circuit held that the plaintiff's "failure to comply with the service and filing requirements incurably frustrated" all the interests outlined above. Pilon, 60 F.3d at 999. The same occurred here. The Government was not notified of the suit, "and therefore could not determine whether the complaint might interfere with any ongoing investigation or whether the Government should intervene." Id. Likewise, "[a]ny settlement value that might have arisen from the complaint's sealed status was eliminated;" "Defendants were placed in the position of having to answer a complaint without knowing who would prosecute the action;" and "any possibility of an ameliorating, predisclosure Government decision not to pursue the Pilons' claim was aborted by the premature publication of the allegations." Id. On these facts, there is no doubt that Plaintiff's FCA claim must be dismissed. Id.; see also Foster v. Savannah Commc'n, 140 F. App'x 905, 908 (11th Cir. 2005) (affirming a district court's order to

dismiss a *qui tam* action "for failure to file within the statute of limitations, and, alternatively, for failure to comply with the procedural filing requirements of § 3730(b)(2)"); <u>Taitz v. Obama</u>, 707 F. Supp. 2d 1, 4 (D.D.C. 2010).

### d.  Federal Home Loan Mortgage Corporation Act (FHLMCA)

Plaintiff's last stand to preserve federal jurisdiction involves an eyebrow-raising reference to the FHLMCA. The Court approaches this claim with suspicion because the FHLMCA is the organic statute creating the Federal Home Loan Mortgage Corporation (or, by its nickname, Freddie Mac). As Defendants correctly note, the vast majority of its provisions concern the authorities and responsibilities of that corporation. In fact, the only prohibition contained in the statute concerns the unauthorized use of the corporation's business name – which is punishable by fines or imprisonment. And so, Plaintiff's claim under this statute stands hostage to a threshold question: whether the FHLMCA provides a private cause of action. After parsing the text of this statute, it is quite evident that there is none.

Notwithstanding, Plaintiff insists that Defendants violated § 1454(a)(2) of FHLMCA. To support his argument, Plaintiff cherry-picks the following text of the statute:

> No conventional mortgage secured by a property comprising one- to four-family dwelling units shall be purchased under this section if the outstanding principal balance of the mortgage at the time of purchase exceeds 80 per centum of the value of the property securing the mortgage

<u>Id.</u> Plaintiff argues that since his property was overvalued, the loan used to purchase the same violated the terms of this subsection. Plaintiff, however, conveniently ignores that this entire section is simply a set of Congressional directives concerning which mortgages <u>Freddie Mac</u> is authorized to purchase as part of its business activities. <u>See</u> § 1454(a)(1) & (a)(2). Plaintiff's claim under the FHLMCA, therefore, is frivolous and must be dismissed.

### e.  Supplemental Claim under Article 1802

As a general rule, "[i]f the federal claims are dismissed before trial, .... the state claims should be dismissed as well." Redondo Const. Corp. v. Izquierdo, 662 F.3d 42, 49 (1st Cir. 2011) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726, (1966)). In deciding whether to exercise supplemental jurisdiction over the remaining claims, the Court must exercise its "informed discretion." Id. Such a determination implicates a weighing of several factors: to wit, comity, judicial economy, convenience, and fairness. Having evaluated the foregoing factors, the Court declines to exercise supplemental jurisdiction over the state-law claims in this case. Comity will be served by permitting the Commonwealth courts to resolve any issues of local concern.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of September, 2016.

_s/ Salvador E. Casellas_
SALVADOR E. CASELLAS
U.S. Senior District Judge
